JONES, Justice.
These consolidated appeals stem from judgments rendered in jury trials for Defendants against Plaintiff[1] on allegations of negligence on the part of the Defendants. Plaintiff appeals, claiming error in the trial court’s order granting Defendants’ motion for directed verdict on the wanton count. Defendant Jacintoport Corporation cross-appeals, alleging error on the part of the trial judge in refusing certain jury charges. We affirm as to each of the respective appeals and the cross appeal.
FACTS
On August 12,1981, at 11:05 in the morning, Bobby T. Shackelford, Plaintiffs intes *68 tate, was killed while operating a tractor/trailer truck along Jacintoport Boulevard, a four-lane paved road located in Mobile County, Alabama. Plaintiff’s intestate was struck by a train as he crossed the tracks at a point where Burlington-Northern’s track crosses Jacintoport Boulevard.
At the time of the accident, Burlington-Northern’s train was traveling in a northerly direction along its tracks, and the tractor/trailer truck driven by Plaintiff’s intestate was traveling in a westerly direction on Jacintoport Boulevard. Another set of railroad tracks owned by the Southern Railway Company runs parallel to and approximately 100 to 110 feet east of the Burlington-Northern crossing at Jacintoport Boulevard. Both tracks are straight and level. On the day of the accident, crossbuck railroad markers were in place on either side of both the Burlington-Northern crossing and the Southern Railway crossing.
Along the route traveled on the day of the accident, approaching the crossing in question from the east to the west along Jacintoport Boulevard, Shackelford passed five signs warning of the crossing before passing over Burlington-Northern’s track.
After passing the entrance to a facility on the right, Shackelford passed a black-on-yellow circular advance warning sign on the right side of the road approximately 270 feet east of the Burlington-Northern crossing, and 160 to 170 feet east of the Southern Railway crossing. This sign was set in place by the governmental authority having jurisdiction over this roadway.
Next, along this approach, is a white railroad warning painted on the roadway, beginning about 100 feet to the east of the Southern Railway crossing. This painted warning is about 30 feet from top to bottom and terminates at a point approximately 70 to 80 feet east of the Southern Railway crossing. This pavement marker was also applied by the governmental authority having jurisdiction over the streets in the area in question.
Shackelford then passed a third sign (sometimes called the “Jacintoport sign”), which warns, “Caution — 2 Track Railroad Crossing,” and which has two four-inch yellow lights above the message. The lights have never been equipped with power, and thus were inoperative on the day of the accident. This sign is on a tall pole that is topped off with a black-on-white railroad-style crossbuck and is 53 feet from the Southern Railway track, and 153 feet from the Burlington-Northern track.
After passing the Jacintoport sign, Mr. Shackelford then passed a crossbuck railroad sign situated immediately to the east of the Southern track; there he came to a complete stop. Passing over the Southern track and continuing to the Burlington-Northern crossing, where the accident occurred, he passed another crossbuck railroad sign immediately to the east of the Burlington-Northern crossing. At this time, Shackelford was traveling at a rate of 5-10 miles per hour. He did not stop at the Burlington-Northern track, but drove onto the Burlington-Northern track. At the point when the front of his truck was over the track, the impact took place.
The train involved in the accident was made up of 33 cars pulled by three locomotives. It was a little more than half a mile long. The lead locomotive was 15 feet high, 10 feet wide, and 50 feet long. It was painted orange and white. Two lights on the front of the locomotive were working at the time of the accident, and were visible during the daylight hours. The truck and trailer driven by Shackelford was 54 feet long. The truck had a flush-front cab.
Louis Simpson, the engineer of the train, stated that, in accordance with normal procedure, he began sounding the whistle and bell a quarter of a mile from the crossing and continued sounding the whistle and bell until the collision occurred. Several other witnesses confirmed that the whistle was sounded before the accident, but Plaintiff presented witnesses who said that the whistle had not been sounded prior to the collision.
As the train approached the crossing, Simpson testified, he was not aware of *69 Shackelford’s approach to the track until he saw the front of the truck projecting over the track. At this time, Simpson was keeping a lookout on the left, or west, side of the cab. Simpson said he continued sounding the bell and whistle as he reached to apply the emergency brake, but found that the brake had already been applied by the brakeman, Walter Beard.
Beard was keeping a lookout on the right, or east, side of the cab as the train approached the crossing. Beard testified he first saw the truck when the train was 400-500 feet from the crossing, as the truck was “slowly” crossing the Southern Railway track and proceeding toward Burlington-Northern’s track. Beard said he thought the truck was going to stop and was “surprised” when he realized the truck was not going to stop, and that immediately upon this realization he applied the emergency brake.
The testimony at trial conflicted as to the speed of the train as it approached the intersection in question. Defendants contended the train was going 35 miles per hour and supported this testimony by introducing the recording of a “tachygraph” device, which recorded the speed of the train on the morning of the accident. Plaintiff’s eye witnesses testified the train was going about 50-55 miles per hour. No speed limit is set by governmental authority, but Burlington-Northern had imposed a speed limit of 40 miles per hour on this track due to “track conditions.”
At the close of all the evidence, the trial court directed a verdict in favor of Defendants on Plaintiff’s wantonness count, and submitted the case to the jury solely on the negligence question. A general verdict was returned in favor of all Defendants. Motions for new trial were subsequently denied. These appeals followed.
ISSUES
Plaintiff’s action for negligence and wantonness against Defendants was based on the following allegations: 1) That the whistle on the train never sounded before the collision; 2) that the “whistle board” notifying the engineer and/or the brakeman to sound the whistle (one-fourth mile from the crossing) was not in place on the day of the accident and consequently would not alert the engineer at what point to begin sounding the whistle; 3) that the train was exceeding a company-imposed speed limit of 40 miles per hour; 4) that the railroad should have issued a “slow order” for the crossing due to the outage of the lights on the Jacintoport sign; 5) that the lights on the Jacintoport sign were inoperative; 6) that visibility to the right and the left of the crossing was poor due to the heavy brush; 7) that Jacintoport undertook to erect a sign which would warn of an approaching train and had failed to complete the project, thereby misleading the public into believing that when the lights were not flashing, a train was not approaching; and 8) that Jacintoport had notice and knowledge of the dangerous conditions present at the crossing.
DECISION
Plaintiff argues that at least a scintilla of evidence existed supporting wantonness and that the wanton count therefore should have been decided by the jury. Plaintiff, in her brief, submits that the key inquiry in determining the existence of wantonness lies in
“a determination of whether the trainmen were conscious of conditions and probable injury. Whether this consciousness comes from the populous and well-traveled nature of a particular crossing ... or from other facts and circumstances, such as the Burlington-Northern’s knowledge in this case of a previous accident and of the fact that nonstandard, non-functioning signals were in place apparently guarding the particular crossing, would again be evidence from which the jury could determine that the railroad ... was conscious of conditions and probable injury to people and motorists traveling in and about the particular crossing.”
Plaintiff cites a string of cases wherein the various courts allowed evi *70 dence of excessive speed to support a claim for wantonness. See, e.g., Glass v. Seaboard Coastline R., 457 F.2d 1387 (5th Cir.1972); Southern Ry. Co. v. Diffley, 228 Ala. 490, 153 So. 746 (1934); Nashville, C. and St. L. Ry. v. Prince, 212 Ala. 499, 103 So. 463 (1925); Northern Alabama Ry. Co. v. McGough, 209 Ala. 435, 96 So. 569 (1923); and Louisville & N.R. Co. v. Rush, 22 Ala.App. 195, 114 So. 21 (1927). These cases, however, deal with “populous crossings,” an issue not addressed at trial, and embraced by Plaintiff only on appeal. No evidence was elicited at trial to support Plaintiffs assertion of the existence of a populous crossing. In fact, only one facility is served by Jacintoport Boulevard, that being the facility Shackelford visited on the day of his death. Speed of the train alone, under these conditions, did not create a scintilla of evidence supportive of a factual finding of wantonness. Northern Ala. Ry. Co. v. McGough, supra.
Moreover, the “prior accident” to which Plaintiff refers did not occur at the crossing here in question; rather, it occurred at the Southern Railway Company’s crossing to the east of Burlington-Northern’s crossing some ten months prior to the accident involved in this case. Plaintiffs counsel made no effort at the trial of this case to show that the “prior accident” occurred under the same or similar circumstances, and the trial court correctly refused to allow any of the evidence of the other accident to be in any way considered by the jury as applicable to Burlington-Northern and its engineer. In fact, Plaintiff expressly stated that evidence of the “prior accident” at the Southern Railway Company crossing was not offered against Burlington-Northern and Simpson, but only against Jacintoport. Furthermore, no evidence was offered at trial as against Burlington-Northern or its engineer that would suggest in any way that these parties knew of the prior unrelated accident.
Plaintiff also alleges wantonness on the part of the railroad in the inspection of the crossing. In support of this proposition, Plaintiff cites Western Ry. v. Still, 352 So.2d 1092 (Ala.1977). We find that case inapplicable to the facts in the case at bar. In Still, this Court affirmed a verdict for plaintiff due to improper maintenance of the crossing itself because the grade of the crossing was higher than the grade of the road, causing plaintiff to skid into an embankment. Here, however, plaintiff does not allege wantonness in the maintenance of the crossing itself, but in the inspection of the Jacintoport sign, which was not on the railroad right-of-way, but on Alabama Power Company’s right-of-way. No evidence was produced at trial that the railroad knew of the existence of the sign, or that the railroad knew it had never been equipped with power. Under these circumstances, the law will not impute such knowledge to the railroad; and, therefore, we must agree with the trial court’s grant of the railroad’s motion for directed verdict. See Stallworth v. Illinois Central Gulf R., 690 F.2d 858 (11th Cir.1982).
Likewise, we find no evidence of wanton conduct on the part of Jacintoport Corporation. Jacintoport did indeed erect a sign and fail to supply it with power. This sign, however, was not intended to operate as a warning of an approaching train; that is to say, it was not equipped with any device connected to the tracks. It was, instead, a “passive” warning signal that merely warned of tracks ahead, not of an approaching train.
Plaintiff attempts to causally connect the existence of this sign with Shackelford’s death. The uncontradicted facts do not bear this out. Shackelford passed two standard railroad warning signs on Jacinto-port Boulevard prior to the Jacintoport sign. He then proceeded 53 feet further, past another standard railroad warning sign, up to the Southern Railroad tracks and came to a complete stop. He then proceeded another 100 feet at a rate of 5-10 miles per hour and drove onto the Burlington-Northern tracks without stopping. Although we cannot, and will not, engage in speculative thoughts as to what the deceased was thinking while driving onto the Burlington-Northern track, we *71 cannot find from the evidence before us, that he relied on the Jacintoport sign situated 53 feet in front of the first track to indicate that no train was approaching on the second track. Rather, we could conceivably find that he relied, mistakenly, on the sign, and proceeded through the Southern crossing, except that the evidence is uncontroverted that he came to a complete stop at that track.
We fail to find the requisite scintilla of wanton conduct on the part of any of the Defendants. The judgment of the trial court, therefore, is due to be, and it hereby is, affirmed. Because we affirm the trial court’s judgment, we need not address the issues raised in Jacintoport’s cross-appeal.
AFFIRMED.
TORBERT, C.J., and MADDOX, SHORES and BEATTY, JJ., concur.

. Due to the complexity of these appeals, we refer to Marie Bradshaw as the Plaintiff/Appellant in the singular. It should be noted, however, that consolidated with Ms. Bradshaw's appeal are the appeals taken by the Intervenor Maryland Casualty Company and by Defendant Standard Fire Insurance Company. Both counsel for Maryland Casualty and for Standard Fire rely on the briefs and oral argument of Ms. Bradshaw’s counsel in pursuing their respective appeals, and, therefore, are bound by this opinion.