456 So.2d 14 (1984)
Mary A. DAVISON, et al.
v.
MOBILE INFIRMARY and Dr. Richard H. Esham.
82-521.
Supreme Court of Alabama.
July 16, 1984.
Rehearing Denied August 24, 1984.
Joseph M. Matranga and Patrick M. Sigler, Mobile, for appellants.
James J. Duffy, Jr. and James J. Duffy, III, of Inge, Twitty, Duffy & Prince, Mobile, for appellee Mobile Infirmary.
W. Boyd Reeves and A. Danner Frazer, Jr. of Armbrecht, Jackson, DeMouy, Crowe, Holmes & Reeves, Mobile, for appellee Dr. Richard H. Esham.
JONES, Justice.
This is a complex medical malpractice case in which the trial judge directed a *15 verdict in favor of one Defendant (Mobile Infirmary), and the jury returned a verdict in favor of the remaining Defendant (Dr. Richard H. Esham). Plaintiffs, Mr. and Mrs. Davison, claiming professional misconduct (negligence and wantonness), contend that Mrs. Davison, while hospitalized at Mobile Infirmary, was permanently blinded as the result of an excessive accumulation of coated aspirin (Ecotrin), which, after amassing in her stomach, passed at once into her small intestine, causing salicylate poisoning.
Because we find that the trial court erred in granting Mobile Infirmary's motion for a directed verdict, and in the giving of certain jury instructions with respect to that portion of the judgment rendered on the jury verdict in favor of Dr. Esham, we reverse and remand this cause for a new trial as to both Defendants on the negligence claims only.

FACTS
Mary A. Davison first visited Dr. Esham, a specialist in internal medicine, in 1975, complaining of stomach problems and vomiting. He diagnosed ulcers and prescribed a soft diet, antacids, and related medications. Having experienced recurrent problems with her stomach and digestive processes, Mrs. Davison was hospitalized by Dr. Esham at Mobile Infirmary in 1975 for corrective surgery by Dr. Larry McGee on an intractable duodenal ulcer. Post-operative care necessitated a stay of approximately two weeks at Mobile Infirmary.
In January of 1977, Mrs. Davison again visited Dr. Esham, complaining that her stomach filled up easily. X-rays revealed the presence of a "bezoar," calcified particles and foreign materials mixed with food and secretions, forming a sausage-like mass. The "bezoar" was treated with meat tenderizer, a common practice for such disorders, and subsequent X-rays showed it to have dissipated. According to Dr. Esham, in April of 1977, he advised Mrs. Davison to take "Ecotrin" for her arthritic condition.[1]
In June of 1977, Mrs. Davison returned to Dr. Esham, complaining of mildly acute symptoms similar to those experienced in 1975 and and earlier in 1977. Suspecting a recurrence of her former condition (the presence of a "bezoar"), Dr. Esham had Mrs. Davison admitted to Mobile Infirmary on Friday, June 24, 1977. She was X-rayed at 8:17 a.m., Sunday, June 26, by Dr. William McDaniel, staff radiologist at Mobile Infirmary.[2]
Because of the specific issues raised on appeal, particularly the trial court's alleged error in granting Mobile Infirmary's motion for a directed verdict, we deem it essential to quote from the trial record certain portions of the medical testimony.[3] Dr. McDaniel (whose agency relationship with Mobile Infirmary is not here in dispute), testified concerning his interpretation of the X-rays made of Mrs. Davison that Sunday morning, in pertinent part:
"Q What part of Mrs. Davison's anatomy does [this x-ray (indicating)] depict, please, sir?
"A Her stomach and upper intestinal tract.
"* * *
"Q [Y]ou see some spots on the x-ray?
"A Yes.
"Q Did you interpret what those spots were?
"A Yes.
"Q And what did you interpret them to be?
*16 "A I said in the report, they had the appearance of medication pills.
"Q And what fact did you base that on at the time you made that interpretation?
"A Having seen them many times before.
"* * *
"Q ... Based upon your interpretation of this x-ray and the wording [of your report], ... was what appeared to be a large amount, a huge amount of medication pills undissolved, did you think it was important to call her admitting physician and report even though he hadn't requested it?
"A I didn't at the time.
"Q ... And you did not, did you?
"A I did not.
"Q ... How did you handle your report on this x-ray?
"A I dictated a report and it was put on the patient's chart.
"Q And what happened to it after that?
"A I don't have any way to know.
"* * *
"Q [I]n addition to interpreting this as being what appeared to be a large amount of medication pills, you also said that it appeared to have the consistency of a bezoar.
"A That's correct.
"Q What is a bezoar?
"A It's an accumulation within the stomach of foreign material other than food that's mixed with food and secretions and forms a sausage-like mass.
"* * *
"Q Did you have a discussion with Dr. Esham about these x-rays?
"A I have never discussed this case with Dr. Esham.
"* * *
"Q How long had you been interpreting x-rays when you interpreted this one that we're looking at here [on June 26, 1977].
"A I went into radiology in 1970.
"Q So, you'd been doing it for seven years?
"A Well, part of that time I was a trainee. I was a resident.
"Q About how many x-rays would you say you see a day?
"A A hundred or more.
"Q You work five days a week? Five hundred a week, two thousand a month?
"A Maybe.
"Q Twenty-five thousand a year?
"A Possibly.
"Q In seven years, maybe a hundred and fifty thousand x-raysjust give or take?
"A It's possible.
"Q Had you ever seen an x-ray that had as many pills in someone's body as this on the date that you saw this on June [26] of 1977?
"A No.
"* * *
"Q Did you consider it to be unusual that you had just viewed an x-ray that has more pills in it than you've seen in a hundred and fifty thousand or so x-rays?
"A I've never seen that many pills in an x-ray of the stomach before.
"Q Did you think it was unusual?
"A Yes.
"Q Was it out of the ordinary?
"A Yes.
"Q Was it an emergency situation?
"A Not in my judgment, but I don't know. I'm not a clinician. I can't make that judgment.
"Q You didn't know what the pills were, did you?
"A That's right.
"Q How could you tell?
"A I couldn't make that judgment.
"* * *
"Q What else would it take, other than what you saw on this x-ray, to deem it an emergency?
*17 "A Well, the first thing that comes to my mind would be if there was some leakagesay if the stomach were ruptured, if there was a tear and some of it was leaking out of the stomach.
"Q By that would you also mean that maybe if some had been going down into the intestine?
"A No. Some of it was out of the stomach through a tear or rupture, that would be a true emergency, and I certainly would have called, you know, immediately, if I had seen such a thing as that.
"* * *
"Q Did you know at the time that you interpreted this x-ray whether or not Mrs. Davison had had any prior surgical procedures for gastric outlet obstruction?
"A Yes, I knew that.... I can see that she's had surgery by the metal surgical clips.
"* * *
"Q Did you tell [Mrs. Davison] of the findings of the x-ray
"* * *
"A No. I did not.
"Q Any particular reason?
"A We never give reports to patients unless the doctor directs us to.
"Q Well. I don't mean handing her the written report. I'm talking about just verbally telling her ... `Mrs. Davison, you have a lot of pills, more than I've seen in seven years'?
"A Oh, no. I never told her that.
"* * *
"Q Did you consider ... the interpretation of the June 26th, 1977, x-ray of Mrs. Davison to be a dangerous condition?
"A Depends on what the pills were, and I have no way of knowing that ....
It could also [not] be a dangerous condition.
"Q Did you consider it to be a potentially dangerous situation?
"A It would depend on what the pills were.
"Q If they were Ecotrin aspirin tablets, would they have been a dangerous condition?
"A It's possible.
"* * *
"Q ... Is it the national standard (of medical care] that if the radiologist working for a private hospital in California or New York or Miami, Florida, would call an admitting physician if he viewed an x-ray of his patient and deemed it an emergency?
"* * *
"A I would say yes.
"Q Would he also call if he deemed it a dangerous condition?
"A Possibly.
"Q ... You've called physicians before under those circumstances, haven't you?
"A Yes."
On Monday, June 27, 1977, Mrs. Davison was visited by Dr. Adrian Bodet, Jr., one of Dr. Esham's partners.[4] Dr. Bodet testified that he first became aware of the X-ray report on the morning of June 27. Dr. Bodet testified, in pertinent part:
"Q Could you be more specific [concerning your first hospital visit with Mrs. Davison]?
"A Well, when I saw the patient on the 27th, the patient was apparently alert and had been to x-ray, and the x-ray had shown a bezoar on the G.I. series. In the normal gallbladder, the G.I. series also showed a spastic outlet from the stomach, and I requested gastroenterology consultation regarding gastropathy on that date, and looking at the doctor's orders, I have *18 a note here: `Consult Dr. Williamson re: gastroscopy.'
"Q [W]hy was this procedure ordered?
"A Because the patient had previous history of intestinal disease with ulcers and a surgical procedure had been previously done and the patient had material in the stomach on the G.I. series .... that should not have been there. It was suggested by the radiologist that it was probably a bezoar, b-e-z-o-a-r."
Dr. Larry McGee, who performed stomach surgery on Mrs. Davison in 1975, also saw her on Sunday, June 26. Rather than quoting directly from the record, we will summarize the substance of Dr. McGee's testimony as follows: Dr. McGee said there was nothing "peculiar" about Mrs. Davison's condition other than the fact that she had had problems in the past. On Monday, June 27, Dr. McGee learned for the first time about the "bezoar" condition which, in his opinion, did not indicate the necessity for immediate surgery. Mrs. Davison, on the 27th, "was in perfectly good condition other than she was having nausea and vomiting periodically from her gastric outlet obstructed stomach." He suggested that she have a gastroscopic examination to determine what type of pills were in her stomach; and, in his medical opinion, there was no indication on that date that "anything else should have been done such as washing out her stomach."
Of her condition when he saw her again on Tuesday morning the 28th, he said "[H]er picture had markedly changed from the time I'd seen her the previous day. And that morning, she was drowsy, hard to rouse, she was breathing rather rapidly, and her blood pressure was down. She was in a semi-shock state .... We increased the rate of her fluids ... then we transferred her to one of our intensive care units and drew some studies to try to find out what was the matter with her."
Further, Dr. McGee was of the opinion that the pills could not have been surgically removed because, "After she got very sick, she was very sick, and we feared for her lifeand at the time the diagnosis was made, or in that period, she had had things going on that would make any surgical procedure a terrible risk .... My note [of July 2nd] says, `Clinically better. Would think surgery only as a last resort for extraction of pills. I would favor pushing hydration and perhaps trying purging with magsulfate via levin tube.'"
Dr. McGee further stated that X-rays done on July 7th or 8th, 1977, "reflected that all the pills were gone" and that he performed surgery on August 9th. It was his opinion that her "life-threatening situation" was caused by her intoxication, which in turn was caused by the Ecotrin impacted in the bezoar, and that none of the doctors who treated Mrs. Davison, including Dr. McDaniel, the radiologist, deviated from the recognized standard of medical care. While the record is not entirely clear on this point, apparently Mrs. Davison was in a total comatose state for about three weeks and did not recover to a fully lucid state until just before the August 9th operation; and, when she was discharged on Friday, August 19, 1977, her condition was medically diagnosed as a permanent loss of vision.
Plaintiffs' expert witness, Dr. George R. Schwartz, a Board certified family medicine practitioner from Albuquerque, New Mexico, with a background in toxicology, testified in pertinent part:[5]
"Q When you were contacted by [Plaintiffs' counsel], what were you told or asked about this case, if anything?
"A I was told that a woman had pills in her stomach which might have represented an emergency situation, and she became blind, and he wondered whether I would review the hospital records and give my opinion as to whether there appeared to have been *19 a mistake made in the management of the patient or in the diagnosis.
"* * *
"Q And what are your opinions?
"A My opinion is that this unfortunate woman developed a bezoar of mixed food and undigested pills. This is an extremely unusual occurrence and one which I believe should have alerted the radiologist to possible seriousnessthe possible emergency nature of this condition. This was not particularly noted and subsequently, some of the pills became ingested and Mrs. Davison developed a severe salicylate poisoning and eventually went into coma. Even when she was in coma, and even once the diagnosis of salicylate poisoning had been made, no attemptno serious attemptwas made to get the pills out of her stomach. When she woke up, she had serious visual impairment, and I believe that, while I cannot pinpoint the exact cause of her visual impairment, I believe it's a toxic impairment related to the poisoning and her coma; or phrasing it another way, in my opinion,... had she not developed this toxication, which included severe poisoning and comatose state, her vision would be normal for her age.
"* * *
"Q [F]rom the time they knew about the pills being there, the treatment that they rendered, would you agree that that was a judgment call based on their training and experience or is it your opinion, and is it your testimony here today, that what they did was a complete deviation of the standard of care of other practicing physicians in this same area of medicine in the national medical community?
"A Yes, it was a mistake.
"Q It was a mistake?
"A Yes.
"* * *
"Q Is the treatment that they rendered acceptable treatment for this type of condition under these circumstances?
"A No.
"Q Under no circumstances?
"A It's under these circumstances.
"Q Well ... that's my questionunder the circumstances which existed, was the treatment which Dr. Eshasm or his partners gave to this patient acceptable medical treatment for this patient?
"A In terms of the subsequent management of her aspirin toxicity, I think that management was excellent. In terms of the management of her kidney failure, her liver disease, I think that management was excellent .... I am focusing now only on the area of the initial intoxication, the pills being in the stomach and the failure to remove these pills which [led] to the intoxication, in that, I believe the treatment was unsuitable.
"* * *
"Q Do you know when she started having difficulties?
"A She said on Monday evening.
"Q Did you note where the doctors had scheduled a [gastroscope] for this lady on the next morning?
"A Yes.
"Q Would that not be an acceptable procedure for the type of condition this lady had?
"A Well, there was still no recognition of the emergency nature of her condition.
"Q Again, ... the fact that they knew this lady had a previous, almost identical experience a few months before, would [that] have made any difference in their treatment of this patient?
"A Yes. It might have made a difference in the treatment of the patient and possibly initially at that point, the physician might be able to say, `Oh, just another bezoar. We can take our time with it.' Even though it was rare, and even though in the radiologist's *20 experience he has never seen such a case before. However, when she began getting sick and began showing signs of toxicity, at that point, removal of the unabsorbed medication became an absolute emergency and this was not treated as such.
"* * *
"Q It's also your opinion as I understand that this salicylate poisoning played some role in this lady's blindness.
"A The salicylate plus other pills, which I suspect were absorbed into this mass, plus the coma.
"Q [H]ave you read any reported cases similar to this where this type of blindness was caused in the patient?
"A No.
"Q This would be a first?
"A This is a very unusual case and in fact, a bezoar of this size, as I said, is unusual at every level, and I have not read a case like this, but I cannot avoid the conclusion that there was a relationship between the intoxication, the coma, and this subsequent blindness.
"Q This was an unusual case from beginning to end, wasn't it, Doctor?
"A Yes.
"* * *
"Q ... What do you think should have been done when the x-ray disclosed the bezoar?
"A I believe that the radiologist should have alerted the treating physician in some special manner to the fact that there was an unusual occurrence.
"* * *
"Q Well, you have testified that this was an unusual case from start to finish; is that right?
"A Yes.
"Q [W]ill you also agree that there was no precedent for what happened here, no reported ... case studies.
"A Yes, that's right.
"Q And yet it's your testimony that this radiologist and these doctors made a mistake in this most unusual set of circumstances.
"* * *
"Q Would it come as a surprise to you that there would be other physicians who would render opinions contrary to what you have told us here today?
"A It would come as a surprise to me if some physician were to say that he did not feel there was any relationship between the intoxication or the toxicity or the coma and the blindness.
"Q Would it come as a surprise to you if some other physician would say that these doctors and radiologists are not guilty of any mistake in their treatment of this patient?
"A Well, I think everyone is entitled to their opinion.
"Q And you have come here from Albuquerque, New Mexico, to give us yours, haven't you, Doctor?
"A Yes, I have indeed."
Upon completion of Dr. Schwartz's testimony under direct examination by Dr. Esham's lawyer, Dr. Schwartz answered the questions of Plaintiffs' lawyer, in part, as follows:
"Q [D]o you have an opinion as to what the radiologist should have done upon seeing the pictures that you have examined and reading the reports which you have examined as to her condition? Do you have an opinion as to what the radiologist should have done at that time; that is, the Sunday morning that they took the x-rays?
"A Yes, I do have an opinion, because this was the only case this radiologist had ever seen, so it was distinctly unusual in his experience, and I feel he should have paid special attention to alert the treating physician of the rarity, or unusual nature, of the circumstances.
"Q Now Mr. Reeves further asked you about the pills that were in her stomach. How difficult would it have been in your opinion to have identified the contents of her stomach after seeing these x-rays?
*21 "A It would have been a procedure taking a very short period of time with no risk whatsoeverminimal risk.
"Q What would that procedure have been?
"A It would have been the insertion of a nasogastric tube to try to aspirate some of the contents and send it to the laboratory for analysis. If that were unsuccessful, then the insertion of a gastroscope ... which could have taken a little piece off of the bezoar, and once again, submitted it to the laboratory for investigation.
"Q Now Mr. Reeves asked you a question about the unusual circumstances of this case, about patients coming in with poisons, and you started to say that usually patients come in sick, but in this case, and then there was another question asked. I would like for you to finish that answer. In this case, what distinguishes that?
"A In this case, there was the knowledge that she had pills in her stomach, and she appeared to be healthy and well and became sick within the hospital.
"Q Dr. Schwartz, you have been at what hospital for the last five years?
"A The University of New Mexico Medical Center.
"Q How big is that hospital?
"A It's about two hundred and fifty beds now.
"Q Are you aware of the standards of the hospitals throughout the nation as to what standards they must adhere to?
"A It's my understanding that unless there is an isolated community of doctors with limited training or experience that there is a national standard.
"Q Are you familiar with that national standard?
"A I believe so .... I believe ... that the standards which are applied to a situation like this are standards of careI'm speaking about the management of patientswould be national standards not based upon, of course, testimony of, you know, national people and discussions of that. It's not that there is a written standard of care somewhere in the sky somewhere, but there is a national standard. You can no longer say, `Well, it's just what the doctor a few miles down the road would do.'
"Q Now, based upon your medical and educational background and your experience as a practicing physician among others, in your review of the medical records on this lady, the plaintiff here, that is including the x-rays and other medical data which you have testified to today, do you have an opinion as to whether or not there was a deviation or departure from the reasonable care, skill, and diligence in the treatment of Mary Davison, which physicians in the national community in the same general line of practice ordinarily have and exercise in a similar case and under these circumstances, do you have an opinion.
"A Yes.
"Q What is that?
"* * *
"A My opinion is that the failure to remove these pills represented a substantial deviation from a standard of care.
"* * *
"Q Do you attach any significance in the failure to identify the contents of the stomach or the identity of these pills?
"A I think the identity becomes less relevant than the removal. If you have a poison, you can spend hours in chambers discussing the nature and the chemistry of the poison, but if you can start removing a poison in five minutes, I think it's best to do that.
"Q And do you have an opinion as to the cause of this lady's blindness?
"A Yes.
"Q What is that opinion?
"A My opinion is that the toxicity due to the absorption of the pills, coupled with her seriously impaired physical *22 state, which included dehydration and alterations in her blood chemistry and her comotose state acted together in such a way as to impair her vision."

ISSUES
Of the several issues presented for our review, we will address at length only one issue as to Mobile Infirmary (the granting of a directed verdict) and one issue as to Dr. Esham (the giving of requested jury Charge No. 36.)

THE APPEAL AS TO MOBILE INFIRMARY
Two separate grounds, now applicable on appeal, were stated in Mobile Infirmary's motion for a directed verdict:
1) Insufficient evidence of any breach of duty; and
2) Lack of proof of any causal connection between Mobile Infirmary's conduct and Mrs. Davison's subsequent injuries.
The trial court rejected ground number one and explicitly based its ruling on the proximate cause issue. We think those quoted portions of the record set out above speak for themselves and that the court was clearly correct in rejecting Mobile Infirmary's insistence upon ground number one.
The following direct quote from Mobile Infirmary's brief summarizes its position on the proximate cause ground:
"To allow the plaintiffs' case against Mobile Infirmary to go to the jury on the state of the record as it existed when the plaintiff closed her case would cause the jury to engage in rank speculation and conjecture. In this connection, there was no proof adduced by the plaintiff at trial that the interval between the time that the radiologist's x-ray report was inserted on the plaintiff's chart and the time when one of her treating physicians first familiarized himself with said report in any way caused or contributed to cause the plaintiff's alleged injuries and damages. The record on this point clearly shows that the plaintiff's condition did not deteriorate until several hours after Dr. Adrian Bodet, who practiced with Dr. Esham, first familiarized himself with the x-ray reports."
Mobile Infirmary next points in its brief to a specific portion of Dr. McDaniel's testimony:
"Q Assume for our purpose here, that Dr. Bodet has testified that he read your report in the early morning of June 27, 1977, before this lady ever got sick. She didn't start getting sick until that night. Assume he read the report, then doesn't that make the whole question of whether you should have called Dr. Esham or didn't call Dr. Esham a moot question?
"* * *
"A Yes, sir."[6]
Mobile Infirmary concludes its argument on this point as follows:
"The magnitude of the speculation which a jury would have to engage in if the plaintiff's case against Mobile Infirmary was submitted to it for consideration is pointed out by the plaintiff herself in her brief when she alludes to the differences of opinion existing among the plaintiff's treating physicians and other physicians who testified at the trial of the instant lawsuit. In this regard, there was a difference of opinion as to the method of removing the medication from the plaintiff's stomach, and if the jury were to decide this question, it would have to speculate as to, initially, which treatment would be chosen and, secondly, as to whether or not such treatment would have prevented her alleged injuries and damages. The trial court correctly *23 ruled in taking the case against Mobile Infirmary away from the jury."
Plaintiffs' lawyer, after detailing the chronology of events throughout Mrs. Davison's hospitalization, argues:
"So there you have it: The patient's got a stomach full of pills but she's in no distress so it's not an emergency. The pills break up and she suffers severe salycilate intoxication and then she's too sick to have any of the recommended procedures performed. She stays in a coma for 8 or 9 weeks and comes out blind. The Plaintiff's expert witness, Dr. Schwartz, says there is a causal relationship. Dr. Okun, the ophthalmologist, says he doesn't know what caused her blindness but it wasn't salycilates. All in all, this lady was discovered to have a very serious and dangerous condition and no one ever got concerned about it until after she got ill and went into a stupor...."
Again, in his reply brief, Plaintiffs' lawyer counters Mobile Infirmary's argument in this manner:
"[Mobile Infirmary's proximate cause] argument is promptly and readily dismissed when the facts are considered concerning the knowledge the Mobile Infirmary's radiologist had upon the interpretation of the x-ray made on the patient.... Dr. McDaniel, the hospital radiologist, testified even though he had interpreted more than 25,000 x-rays he had never seen such a large number of pills depicted on an x-ray before. Dr. McDaniel also testified that in cases [that] he deemed to be an emergency situation the policy of the hospital was to call the physician whether the physician requested it or not. However, the Mobile Infirmary's radiologist did nothing other than to handle it in a routine manner without even alerting the patient. Dr. Schwartz testified that it was indeed an emergency situation and that the hospital's radiologist should have notified the physician or told the patient immediately so that something could have been done to alleviate this medical crisis. Further, Dr. McDaniel testified that when he did alert the physician as to his findings of an emergency situation they generally came to the hospital themselves immediately to determine what course of action to take. There is nothing to dismiss the theory that had Dr. McDaniel done this in this case a physician would have arrived at the hospital immediately and a remedial course of action taken to determine what the pills were in the patient which would have defused the medical time-bomb that was present in the patient's stomach."
The parties cite the same cases and express a common understanding of the substantive law, as well as the standards of review, that govern this case. As between Mr. and Mrs. Davison, as Plaintiffs, and Mobile Infirmary, as Defendant, the resolution of the dispositive issue depends upon this Court's independent review of the record to determine whether Plaintiffs' evidence presents a prima facie case. We hold that it does.
In granting Mobile Infirmary's motion for a directed verdict, the trial court clearly felt that the missing causal link in the Plaintiffs' chain of evidence consisted of the treating physicians' testimony with respect to their negative conduct after knowledge of the X-ray reports. The apparent logic of this position, supposedly, is this: If Dr. Esham and his medical group did not act upon such information, once they learned of the report some 24 hours after it was routinely filed by Dr. McDaniel, then his failure to directly communicate the report to Dr. Esham earlier could not have made any difference in Mrs. Davison's treatment.
The flaw in this reasoning is two-fold: 1) The trial court correctly held, in overruling Dr. Esham's motion for a directed verdict, that the evidence made out a jury issue with respect to Dr. Esham's alleged failure to act upon the X-ray report; but then, the trial court erroneously resolved a yet unresolved jury issue as to Dr. Esham's negligence and used that finding as a factual premise for its order directing a verdict for *24 Mobile Infirmary; and 2) it assumed, as a factual conclusion, that this 24-hour delay was not a critical period in the medical decision-making process, particularly in view of Mrs. Davison's rapidly deteriorating condition.
At the risk of repetition, we restate the rationale for our holding. Because Dr. Esham testified he would not have treated the patient sooner had he known earlier of the X-ray findings, the trial court reasoned that, even if the Hospital was negligent, there was a failure of proximate cause. In directing the verdict for the hospital, the trial court usurped the jury's prerogative and decided a factual questionthe question of the credibility of Dr. Eshameven though the court submitted that very factual issue to the jury.
The jury, acting within its exclusive factfinding province, could have concluded that it was in the treating doctor's self-interest to say he would have done nothing sooner, for to have said otherwise would have been an admission of guilt, where, as here, he did nothing sooner or later to alleviate the toxic condition. As a premise for its directed verdict holding, the trial court also decided an additional factual question whether the X-ray doctor's report, as routinely handled, adequately apprised the treating doctor of the unusual and dangerous potential of that which was revealed by the X-ray. This, too, involved the credibility of the witness, which is always for the jury.
In addition to the affirmative proof bearing on this issue, as detailed in the quoted portions of the transcript, certain matters about which the record is silent furnish reasonable inferences favorable to Appellants' prima facie case against Mobile Infirmary: 1) In spite of Dr. McDaniel's X-ray interpretation that the stomach bezoar contained a large quantity of undissolved pills, whose life-threatening potential could not have been known until their identity was learned, the record reveals that none of the doctors asked Mrs. Davison, or any member of her immediate family, what medication she was taking, when, according to Dr. McGee, she remained lucid for 36 hours or more after Dr. McDaniel read the X-rays; 2) the record is devoid of any rational medical explanation (except for the testimony of Dr. Schwartz) as to when Mrs. Davison's condition worsened to a degree necessitating removal of the caustic materials, perhaps by nonsurgical procedures, as opposed to when her condition became so acute as to preclude any removal, even by surgical means; 3) while the Defendants seek to excuse their nonemergency routine treatment in the instant situation on the basis of their successful treatment of Mrs. Davison's prior stomach bezoar, the record is silent as to any threat of salicylate poisoning due to impaction of coated aspirin during the January 1977 experience; and 4) finally, and most telling of all, there is no evidence that even the simplest procedures, including the administration of meat tenderizers, which accounted for the successful treatment in January of 1977, were applied in June of 1977.
Surely, these negative or nondisclosed factors, which, when considered alone or in combination, coupled with the general agreement among all the medical experts that this large quantity of salicylate-producing poison should have been neutralized or removed as soon as possible, give rise to a reasonable inference that the first 24 hours following Dr. McDaniel's Sunday morning X-rays was indeed a crucial period for appropriate treatment designed to diffuse this "medical time bomb."
Ordinarily, the proximate cause issue is one for the jury; and it becomes a legal issue only where there is a total lack of evidence from which the factfinder may reasonably infer a direct causal relation between the culpable conduct and the resulting injury. Marshall County v. Uptain, 409 So.2d 423 (Ala.1981). We are unable to hold, as a matter of law, that the totality of the instant circumstances falls short of Plaintiffs' requisite proof with respect to the element of proximate cause.

THE APPEAL AS TO DR. ESHAM
Dr. Esham's requested jury Charge No. 36 reads:

*25 "The Court charges the jury that if you are reasonably satisfied from the evidence in this case that the injuries and damages to the plaintiffs were the proximate result of the acts or omissions of others over whom the Defendant, Dr. Esham, had no control and who were not acting for him, then you cannot return a verdict against Dr. Esham in this case."
Appellants summarize their argument in opposition to this jury instruction as follows:
"Plaintiffs excepted to Defendant Esham's Charge No. 36, on the grounds that it was [an] incorrect statement of law in that it failed to give proper consideration to combined and concurring negligence. The Court in giving Defendant Esham's Charge No. 42 charged the jury that a non-party to the case, the radiologist for the Mobile Infirmary, was not one whose negligence was to be considered as combining and concurrent with the negligence of Defendant Esham. The Plaintiffs' Charge No. 2 charged the jury that if one or more persons were negligent, each negligent person would be liable for the resulting injury and the negligence of each would be deemed the proximate cause of the injury. In giving Defendant Esham's Requested Charge No. 36 along with Plaintiffs' Requested Charges 2 and 4, the Judge charged the jury that if another's acts or omissions caused injury to the Plaintiff and Dr. Esham had no control nor were they acting for him, then the jury could not return a verdict against Dr. Esham in the case. This is contrary to the charges on combined and concurring negligence for under that doctrine Dr. Esham would not have to have any control nor would there have to be any agency for the negligence of others to combine and concur with his."
Dr. Esham, citing Wood Chevrolet Company v. Bank of the Southeast, 352 So.2d 1350 (Ala.1977), 2A C.J.S. Agency § 6 (1972), and Alabama Pattern Jury InstructionsCivil, § 3.00 (1974), summarizes his defense of Charge No. 36 as follows:
"Defendant's charge No. 36 did nothing to abrogate the Plaintiffs' charges on combined and concurring negligence but simply told the jury that Dr. Esham could not be held liable for the acts of others over whom he had no control and who were not acting for him .... This had nothing to do with the combined and concurring negligence charges of the Plaintiff, and when the entire charge of the Court is considered, the charge No. 36 was in no way confusing or misleading."
Here, again, the parties agree on the applicable law, but disagree whether this instruction, in the context of this case, was erroneous or misleading. We have no doubt that Dr. Esham's counsel intended to have the court instruct the jury that Dr. Esham could not be held liable for the negligence of others who were not acting on his behalf; that is, it was intended simply as a charge with respect to the issue of agency. To be sure, in other contexts, it may have been susceptible to no other reasonable interpretation; but, in the instant context, it was a misstatement of the applicable law.
Rather than being a simple agency charge (i.e., that Dr. Esham could not be liable for acts of others not his agents), Charge No. 36 says in effect: If Plaintiffs' injuries were caused by others, not his agents, then Dr. Esham himself could not be liable. Under the law of combining and concurring negligence, however, Dr. Esham may be liable for his own negligence, notwithstanding the fact that others, not his agents, are also liable for their negligence.
Marshall County v. Uptain, 409 So.2d 423 (Ala.1981), approved the following charge:
"Proximate cause is also defined as that cause, which in the natural and probable sequence of events and without the intervention of any new or independent cause, produces injury, and without which, such injury would not have occurred. If one *26 is guilty of negligence, which concurred or combined with the negligence of another, and the two combine to produce injury, each negligent party is liable for the resulting injury, and the negligence of each will be deemed the proximate cause of the injury.
"If you find that the sole proximate cause of the plaintiff's injury was the negligence of Judy Kaylor Phillips, then the plaintiff cannot recover against Marshall County. If, however, you find that the proximate cause of the plaintiff's injury was the combined negligence of Judy Kaylor and Marshall County, then the plaintiff could recover against Marshall County." 409 So.2d at 425.
When the approved charge in Uptain is compared with the given instruction in the instant case, the deficiency in the charge under review becomes readily apparent, because of its lack of any reference to combining or concurring negligence. Cf., also, the given requested charges disapproved in Coggins v. Fuller, 284 Ala. 44, 221 So.2d 681 (1969), virtually identical to the given requested charges in this case.
Charge No. 36, as given, does not take into account the well-recognized principle of tort law that where separate causes act contemporaneously to produce a given result, the causes of injury are concurrent within the rule making separate wrongdoers equally liable for the resultant injury; and this rule operates wholly independent of the law of principal and agent. Aplin v. Dean, 231 Ala. 320, 164 So. 737 (1935). See, also, A.P.J.I. Civil §§ 28.04 through .06, and § 3.00. Despite the trial court's earlier correct instructions on the law of combining and concurring negligence, the omission of this vital principle from Charge No. 36, which was specifically pointed out by the objection of Plaintiffs' counsel pursuant to A.R.Civ.P. 51, rendered the trial court's giving of this charge reversible error. Coggins, supra, citing Baggett v. Sellers, 282 Ala. 235, 210 So.2d 796 (1968).
In conclusion, we concur with the trial court's order granting Dr. Esham's motion for a directed verdict on Plaintiffs' claims for wanton misconduct. We view the evidence as falling short of the requisite quantum of proof from which the jury could reasonably infer that Dr. Esham was guilty of an intentional act, or an intentional failure to act, which was likely to result in injury to another. Bradshaw v. Simpson, 442 So.2d 66 (Ala.1983).
Therefore, we affirm that portion of the judgment below directing a verdict for Dr. Esham on Plaintiffs' theory of wantonness; and we reverse the judgment and remand the cause for retrial as to both Defendants on Plaintiffs' claims for negligence only.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
TORBERT, C.J., and ALMON, SHORES, EMBRY, BEATTY and ADAMS, JJ., concur.
MADDOX and FAULKNER, JJ., concur in part and dissent in part.
MADDOX, Justice (concurring in part and dissenting in part).
I concur in the opinion insofar as it reverses the judgment of the trial court which directed a verdict in favor of Mobile Infirmary. I dissent insofar as the opinion reverses the judgment entered upon a jury verdict rendered in favor of Dr. Richard H. Esham.
FAULKNER, J., concurs.
NOTES
[1] "Ecotrin" is a chemically coated aspirin, designed to pass into and through the stomach cavity before dissolving in the small intestine. It is often used in the treatment of arthritis for patients with high stomach acidity.
[2] Mary Davison was admitted to Mobile Infirmary on Friday afternoon, June 24, 1977. X-rays were scheduled for Mrs. Davison on Saturday, but, because of her inability to ingest certain liquids necessary for X-rays at that time, the X-rays were rescheduled and completed Sunday, June 26.
[3] For the sake of brevity, we have taken the liberty of excluding certain extraneous and repetitious sentences and phrases from the quoted portions of the transcript.
[4] Mary Davison was visited by Dr. Pennington (a partner of Dr. Esham) on Saturday and Sunday, June 25 and 26, and by Dr. Bodet on Monday, June 27. Dr. Esham did not personally see Mrs. Davison until Wednesday, June 29, 1977, five days after she was initially hospitalized.
[5] While offered on Plaintiffs' behalf at trial, the deposition of Dr. Schwartz was taken by counsel for Dr. Esham.
[6] For the sake of clarity, it should be noted that the reference in this question to "before this lady ever got sick" and "she didn't start getting sick" all refer to Mrs. Davison's relative state of well-being during her first several days in the hospital. Admittedly, she was not "well" when she entered the hospital. This comment is not intended as criticism of counsel's question. He was simply using the same frame of reference as used by several of the doctors who testified.