Lillian Wassman sued the Mobile County Communications District ("MCCD") and others[1] for the alleged wrongful death of her son, Michael Wassman. The jury awarded her $1,000,000 in damages. MCCD moved for a judgment notwithstanding the verdict or, in the alternative, for a reduction of the $1,000,000 verdict to $100,000, pursuant to the statutory cap on claims against governmental entities (Ala. Code 1975, §§ 11-93-1(1) and -2). The trial court issued the following order:
 "As to the statutory cap, the court finds that MCCD is a county public corporation and a governmental entity as defined by § 11-93-1(1) and thus the amount recoverable for tort claims against MCCD for one person for one occurrence is limited to $100,000.
 "As to causation, the court finds there is no credible evidence proving that the negligence or wrongful conduct on the part of MCCD proximately caused the death of [Mrs. Wassman's son, Michael]. The court thus enters judgment in favor of MCCD notwithstanding the verdict."
Mrs. Wassman appeals, presenting two issues: Did the trial court err 1) in applying §§ 11-93-1(1) and -2 and thus reducing the amount recoverable to $100,000? and 2) in granting the MCCD's motion for a JNOV on the ground of insufficiency of the evidence as to the element of proximate cause? We conclude that the trial court properly held recoverable damages were limited by the statute, but we must reverse the JNOV.
A question underlying issue 1 is whether the MCCD is a "governmental entity" entitled to the benefit of the cap on recoverable damages imposed by § 11-93-2. Section 11-93-1
defines "governmental entity" as "[a]ny incorporated municipality, any county and any department, agency, board or commission of any municipality or county, municipal or county public corporations and any such instrumentality orinstrumentalities acting jointly." (Emphasis added.)
Our agreement with the trial court regarding the recoverable amount is based on our study and analysis of Ala. Acts 1984, Act No. 84-369 (codified at § 11-98-1 et seq., and empowering counties and municipalities to create communications districts) and two Alabama cases dealing with essentially the same issue:Guntersville Housing Authority v. Stephens, 585 So.2d 887
(Ala. 1991), and Northwest Alabama Gas District v. City of Guin,569 So.2d 341 (Ala. 1990).
A full recital of Act No. 84-369 is not necessary; the first two sentences of the act will suffice:
 "The municipal or county governing body of any municipality or county may by ordinance create within its respective jurisdiction communications districts composed of the territory lying wholly within the municipality or of any part or all of the territory lying wholly within the county. Such districts shall be political and legal subdivisions of the state, with power to sue and be sued in their corporate names and to incur debt and issue bonds."
Mrs. Wassman asks this Court to recognize a distinction between this case and Guntersville Housing Authority andNorthwest Alabama Gas District, both of which cases rejected the contention that the agency in question was an agency of the state. She invites our attention specifically to the language in the statute authorizing the creation of the MCCD: "Such districts shall be political and legal subdivisions of the state, with power to sue and be sued in their corporate names and to incur debt and issue bonds."
Then, to escape what otherwise would be a "sovereign immunity" trap, Mrs. Wassman, citing Tallaseehatchie CreekWatershed Conservancy District v. Allred, 620 So.2d 628
(Ala. 1993), adds: "This language [quoted from Allred] clearly lifts sovereign immunity from the District." While, on the one hand, we understand Mrs. Wassman's dilemma *Page 943 
(avoiding the immunity defense available to a state agency while also avoiding the damages cap applicable to a county), we cannot, on the other hand, ignore the Allred holding and its rationale. Notwithstanding similar language in the statutory authorization for the watershed conservancy district ("[it] shall constitute a governmental subdivision of this state and a public body, corporate and politic, exercising public powers"), the Allred Court held that the district was not an agency of the state for civil liability purposes, quoting from and applying Armory Commission of Alabama v. Staudt, 388 So.2d 991
(Ala. 1980):
 "We . . . hold that some determination, other than the fact of incorporation, is required. Whether a lawsuit against a body created by legislative enactment is a suit against the state depends on the character of power delegated to the body, the relation of the body to the state, and the nature of the function performed by the body. All factors in the relationship must be examined to determine whether the suit is against an arm of the state or merely against a franchisee licensed for some beneficial purpose."
388 So.2d at 993.
Perhaps an even clearer example of the proposition that asubdivision of the state is not necessarily an agency of the state is the political unit of a county. That an Alabama county is a governmental subdivision of the state is a given
proposition; yet, for civil liability purposes, it is also a given that the county is not an agency of the state.[2] For example, an action against a county invokes the "allowable damages" cap of § 11-93-2, but not the constitutional immunity defense available in actions against the state.
Although Allred does not cite either Guntersville HousingAuthority or Northwest Alabama Gas District (properly so, because the damages cap issue in these two earlier cases was not the issue in Allred), the "state agency" language in all three cases is totally compatible.
Applying the Staudt test, we hold that two factors are predominant and thus determinative here: 1) As authorized by the empowering statute (Act No. 84-369), the Mobile County Commission, following a public referendum, created the MCCD by way of a county ordinance, and Mobile County, along with the City of Mobile, operated the system; and 2) the "power to sue and to be sued" language in the empowering statute is incompatible with the constitutional immunity with which state agencies are cloaked.
Thus, we hold that the trial court properly held applicable the damages cap (§ 11-93-2), thereby holding that the plaintiff's recoverable damages would be limited to $100,000. As to issue 1, then, we agree with the trial court.
With regard to issue 2, however, we hold that the trial court did err in granting the MCCD's motion for a JNOV on the ground of insufficient evidence of the tort element of proximate cause. We do not understand the trial court's order as a ruling with respect to the sufficiency of the evidence on the tort elements of legal duty and breach of that duty; rather, the trial court's order assumes the sufficiency of the evidence relating to those threshold elements, and it rules that the evidence is insufficient, as a matter of law, as it relates to the element of proximate cause.
To enter the JNOV for the MCCD, the trial court necessarily treated the "proximate cause" issue as a question of law. The court's ruling would have been proper if there had been a "total lack of evidence from which the factfinder [might] reasonably infer a direct causal relation between the culpable conduct and the resulting injury." Davison v. Mobile Infirmary,456 So.2d 14, 24 (Ala. 1984). Our review of the record, however, convinces us that there was substantial evidence from which the jury could have reasonably inferred that the proximate cause of Michael Wassman's death was the conduct of the MCCD or its agents. Ala. Code 1975, § 12-21-12; West v. Founders LifeAssurance Co. of Florida, 547 So.2d 870 (Ala. 1989). *Page 944 
In 1984, the legislature authorized counties and municipalities to create "communications districts" for the purpose of "establishing a local emergency telephone service, to provide for the governing body of the district, including its powers, and to provide for funding for such district." Act No. 84-369, Ala. Acts 1984, p. 854. The citizens of Mobile County voted to establish a communications district, and it began operations in 1985.
When the MCCD was created, Karen Welch was employed by the Mobile County Sheriff's Department as a dispatcher. When the MCCD began operating, employees of the City of Mobile Police Department, the City of Mobile Fire Department, and the Mobile County Sheriff's Department worked in a separate MCCD building and responded to emergency calls; which department responded depended upon where the call originated (city or county jurisdiction) and upon what emergency services were needed (fire, paramedic, ambulance, law enforcement, etc.).
Ms. Welch testified that, although she was answering telephone calls for the MCCD, she was at all times an employee of the Mobile County Sheriff's Department; however, Jerry E. Holloway (who was fire chief for the Tanner-Williams Fire and Rescue Service, a training officer for the Prichard Fire Department, and a member of the MCCD's board of commissioners) testified that employees of all three emergency services were supposed to be under the "uniform direction and control" of the MCCD. Holloway also testified that in 1990 the MCCD adopted a policy statement indicating that the MCCD had the "responsibility and authority to set the necessary policy regarding the implementation and handling of 911 emergency telephone calls."
In 1986, seven-year-old Michael Wassman was hit by a car and sustained injuries that caused him to be a ventilator-dependent quadraplegic. A permanent tracheostomy allowed for the insertion of a tube that, when attached to a ventilator, provided air to Michael's lungs. Michael's mother was trained to perform the changing of the tube, which was done regularly every two weeks to one month.
On February 15, 1991, Mrs. Wassman began the procedure for changing Michael's tube. She testified that she routinely kept the telephone within her reach during these procedures in case a problem arose. On this occasion, Mrs. Wassman experienced difficulty in inserting the tube, and she dialed "911" for assistance; however, Mrs. Wassman received no answer to her "911" call.
The evidence shows that on February 15, 1991, dispatcher Karen Welch reported to work at the MCCD building at 2:00 p.m. and was assigned to a "D-10" dispatch terminal. Welch testified that she left her work station for a short time because she was upset over receiving a letter advising her of an upcoming disciplinary hearing regarding a matter that had occurred several weeks earlier. Welch's supervisor spoke with Welch and advised her to return to work.
Because Welch was so upset, the supervisor allowed Welch to transfer from a dispatch terminal to a "C-1" terminal that received incoming calls. The operator of the "C-1" terminal had, within reach, a printer that produced a printed copy of incoming calls and the status of each call. Unanswered calls or calls that ended because the caller had disconnected were identified on the printout with "00." The printout also showed the telephone number from which the "00" call was made, as well as the time the call came in to the MCCD telephone and the time the call ended. The "C-1" terminal operators were required to monitor this printout and to return the "00" calls.
Testimony regarding the time within which "00" calls were to be returned varied from "immediately" to "whenever we could," in relation to the workload. Welch stated that there was no specific time set for when to return "00" calls. Commissioner Holloway testified that the MCCD's board of commissioners had adopted a policy for returning "00" calls that stated, in part, "[u]nder no circumstances should there be a delay for emergency response." The MCCD policy statement was given to the employees of the three entities that staffed the MCCD building, and Welch testified that she agreed with it. *Page 945 
The MCCD printout for February 15, 1991, showed that Mrs. Wassman's unanswered call came in to the MCCD terminal at 3:42 p.m., that it was identified by the MCCD computer as an "00" call, and that it was returned by Welch at 4:21 p.m. — 39 minutes after it had been received. During the 39-minute period following her "911" call, Mrs. Wassman telephoned Newman's Ambulance Service, which was located within a few miles of her home. Newman's told her an ambulance would be dispatched to her home; however, the ambulance experienced mechanical problems and was replaced with an ambulance that had to come from downtown Mobile — 16 miles away — and that had to be refueled before making the trip to Mrs. Wassman's home. The ambulance reached the Wassman home at 4:13 p.m. The trip to the hospital took 10 minutes. Testimony at trial also showed that the ambulance service and the paramedic service that would have received Mrs. Wassman's "911" call, had it been answered, were only a short distance from the Wassman home. The Newman's Ambulance Service paramedic who treated Michael at home stated that if the swelling (which began to appear after the first 10 minutes) had not been present, he would have "had a much easier time . . . ventilating [Michael]."
Mrs. Wassman testified that while they were waiting for emergency personnel to arrive, she and an attending nurse used an "ambu bag" and other manual measures to assist Michael's breathing. Mrs. Wassman stated that, during the first 10 minutes following her unanswered "911" call, Michael's vital signs were good. She stated that during that time Michael had a good pulse, had good color in his face and around his fingernails, and had a good "chest rise." However, when the paramedic arrived, approximately 30 minutes after the "911" call, he found Michael's tissues to be so swollen that an air tube could not be inserted.
After an autopsy, "asphyxia," or a lack of oxygen, was established as the cause of Michael's death. Mrs. Wassman's expert witness, pathologist Dr. Linda Norton, testified that, during the manual ventilation efforts following Mrs. Wassman's "911" call, Michael suffered a "pneumothorax," or a puncture of the lung caused by excessive pressure.
Dr. Norton stated that, in a situation such as this, irreversible brain damage does not occur until after 10 minutes of respiratory arrest, and that death does not occur until after 20 minutes of respiratory arrest. And, testified Dr. Norton, Mrs. Wassman's testimony regarding Michael's condition during the first 10 minutes of manual ventilation indicated that respiratory arrest had not yet occurred. Dr. Leroy Riddick, state medical examiner for Southwest Alabama, performed the autopsy on Michael Wassman; he agreed that Mrs. Wassman's evidence regarding Michael's condition would indicate that in the first 10 minutes of this emergency, respiratory arrest had not occurred. None of the medical experts could state at what point the pneumothorax occurred.
Having reviewed the evidence in a light most favorable to Mrs. Wassman's claim against the MCCD, and allowing for the reasonable inferences therefrom that the jury was free to draw and not inferences we (or the trial court) might think are more probable (Ritch v. Waldrop, 428 So.2d 1 (Ala. 1982)), we conclude that the trial court improperly substituted its judgment for that of the jury on the issue of proximate cause. We are reminded of the following principle approved in previous decisions of this Court:[3]
 "An essential element of the plaintiff's cause of action for negligence, or for that matter for any other tort, is that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered. This connection usually is dealt with by the courts in terms of what is called 'proximate cause.' "
Prosser and Keeton on The Law of Torts § 41, p. 263 (5th ed. 1984).
We hold, therefore, that the trial court erroneously entered the judgment notwithstanding the jury's verdict. That judgment, *Page 946 
therefore, is reversed and the cause is remanded. The trial court is instructed to set aside the JNOV and to enter a judgment based on the verdict, but reducing Mrs. Wassman's recoverable amount of damages to $100,000.
This opinion was prepared by retired Justice Richard L. Jones, sitting as a Justice of this Court pursuant to §12-18-10(e), Ala. Code 1975.
REVERSED AND REMANDED WITH INSTRUCTIONS.
ALMON, SHORES, INGRAM, and COOK, JJ., concur.
BUTTS, J., concurs in the result.
[1] The other defendants were dismissed on the motion of the plaintiff at various times during the pendency of this matter in the trial court.
[2] For purposes other than civil liability, a county has been referred to as "an agency and political subdivision of the state crated by law for the more efficient administration of government." Sexton v. State, 392 So.2d 1239, 1240
(Ala.Crim.App. 1980), and the authorities cited therein.
[3] See, for example, Kyle v. Selma Medical Center Hospital, Inc.,534 So.2d 589 (Ala. 1988). See, also, Hilliard v. HuntsvilleElec. Util. Bd., 599 So.2d 1108 (Ala. 1992).