On November 20, 2003, Alberta D. Abrams, the house manager of the Old Military Road Group Home, a long-term mental-health-care residential facility located in Theodore and owned and operated by the Greater Mobile-Washington County Mental Health-Mental Retardation Board, Inc. ("the Board"), was driving a 15-passenger van owned by the Board on Inter-state 10 in Mobile County. Eleven residents of the group home were passengers in the van, including Dwight Eric Kininessi, and Abrams was in the process of transporting them from a "Survivors of Mental Illness" social outing to a local bank. A tire failure occurred, the van wrecked, and Kininessi was killed as a result of the accident. His mother, Abbie L. Kininessi, as administratrix of his estate, filed an action in the Mobile Circuit Court against Abrams and the Board, as well as entities asserted to have designed, manufactured, sold, etc., the allegedly defective tire and the allegedly defective van. The Board and Abrams filed motions for a summary judgment on the basis of various types of immunity, the Board claiming the protection of sovereign immunity and "substantive immunity" and Abrams claiming the shield of "State-agent" immunity. The circuit judge assigned the case denied the motions, and the Board and Abrams petitioned this Court for a writ of mandamus directing him to grant their motions. We deny the petition.
 Standard of Review "While the general rule is that the denial of a motion for summary judgment is not reviewable, the exception is that the denial of a motion for summary judgment grounded on a claim of immunity is reviewable by petition for writ of mandamus. Ex parte Purvis, 689 So.2d 794 (Ala. 1996). . . . *Page 992 
 "Summary judgment is appropriate only when `there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.' Rule 56(c)(3), Ala. R. Civ. P., Young v. La Quinta Inns, Inc., 682 So.2d 402 (Ala. 1996). A court considering a motion for summary judgment will view the record in the light most favorable to the nonmoving party, Hurst v. Alabama Power Co., 675 So.2d 397 (Ala. 1996), Fuqua v. Ingersoll-Rand Co., 591 So.2d 486 (Ala. 1991); will accord the nonmoving party all reasonable favorable inferences from the evidence, Fuqua, supra, Aldridge v. Valley Steel Constr., Inc., 603 So.2d 981
(Ala. 1992); and will resolve all reasonable doubts against the moving party, Hurst, supra, Ex parte Brislin, 719 So.2d 185 (Ala. 1998).
 "An appellate court reviewing a ruling on a motion for summary judgment will, de novo, apply these same standards applicable in the trial court. Fuqua, supra, Brislin, supra. Likewise, the appellate court will consider only that factual material available of record to the trial court for its consideration in deciding the motion. Dynasty Corp. v. Alpha Resins Corp., 577 So.2d 1278
(Ala. 1991), Boland v. Fort Rucker Nat'l Bank, 599 So.2d 595 (Ala. 1992), Rowe v. Isbell, 599 So.2d 35 (Ala. 1992)."
Ex parte Rizk, 791 So.2d 911, 912-13 (Ala. 2000).
Among the circumstances a petitioner for a writ of mandamus bears the burden of showing are a clear legal right in the petitioner to the order sought and an imperative duty upon the respondent to perform, accompanied by a refusal to do so.Ex parte Glover, 801 So.2d 1, 6 (Ala. 2001).
Creation and Organization of the Board
As explained in Williams v. Eastside Mental Health Center,Inc., 669 F.2d 671, 673 (11th Cir. 1982):
 "The state of Alabama first began treating mental patients in its state hospitals in 1861. Up through the 1960's Alabama provided comprehensive mental health services in state institutions such as Bryce Hospital, Searcy Hospital, and Partlow State School. In addition the state helped fund some smaller community mental health centers.
 "In 1965 the State Department of Public Health completed a two-year, federally financed study to plan for statewide provision of mental health services. This study recommended the establishment of a network of smaller, but comprehensive mental health centers throughout the state. Subsequently the state passed legislation creating the Department of Mental Health (the Department), see Ala. Code § 22-50-1 (1977), and enacted specific legislation to govern the creation and operation of regional authorities to administer a network of community mental health centers. See Ala. Code § 22-51-1 (1977). All boards and corporations established pursuant to the provisions of this Act are statutorily designated as public corporations. Ala. Code § 22-51-2 (1977). The Department then divided the state into mental health regions, and established mental health authorities under section 22-51-2 to organize and administer the provision of services for each region."
(Footnote omitted.)
The 1965 legislation creating the Department of Mental Health was amended in 1984 to redesignate that department as the Department of Mental Health and Mental Retardation, continuing its expressly declared status as "a department of the State government" (hereinafter "the Department"). That legislative scheme, as amended, is codified as § 22-50-1 et seq., Ala. Code 1975. *Page 993 
"The Department, as an agency of the State of Alabama, has absolute immunity from lawsuits based upon the long-standing principle of sovereign immunity set forth in Article I, §14, of the Alabama Constitution of 1901." Ex parte AlabamaDep't of Mental Health Mental Retardation,837 So.2d 808, 811 (Ala. 2002). The Department
 "is authorized and directed to set up state plans for the purpose of controlling and treating any and all forms of mental and emotional illness and any and all forms of mental retardation and shall divide the state into regions, districts, areas or zones, which need not be geographic areas, but shall be areas for the purpose of establishing priorities and programs and for organizational and administrative purposes in accordance with these state plans."
§ 22-50-11(1). Likewise, the Department
 "is designated and authorized to supervise, coordinate and establish standards for all operations and activities of the state related to mental health and mental retardation and the providing of mental health services and mental retardation services; and it is authorized to receive and administer any funds available from any source for the purpose of acquiring building sites for, constructing, equipping, maintaining or operating mental health centers, and community mental retardation programs or facilities or institutions for the purpose of providing mental health services and mental retardation services."
§ 22-50-11(2). The Department is "authorized to enter into contracts with any other state or federal agency or with any private person, organization, or group capable of contracting if it finds such action to be in the public interest." §22-50-11(4). It may purchase or lease land or acquire property by eminent domain, and it can "sell, exchange or otherwise transfer property, land, buildings or equipment in order to carry out its duties and responsibilities." § 22-50-11(9). Section 22-50-9 authorizes the Department "to act in any prudent way to provide mental health services and mental retardation services for the people of Alabama." It is obliged to present the governor a request for funds "every budget period" and "the Governor shall include in his appropriation bill a request for funds to meet the financial needs of the department." §22-50-14. Section 22-50-15 provides:
 "Any state supported facility under the jurisdiction of the department providing services requiring on-premises residence of patients or clients, including, but not limited to, Bryce Hospital, Searcy Hospital, and Partlow State School and Hospital, shall be considered an essential function of the state, and funds allocated for the support of said state supported facilities shall not be subject to proration at any time a deficit occurs in the general funds."
In 1967 the legislature passed Act No. 310, codified as Ala. Code § 22-51-1 et seq., which authorized the incorporation of the Board. That statutory scheme provides as follows: Three or more natural persons "may form a public corporation to contract with the State Board of Health or the Alabama Department of Mental Health and Mental Retardation in constructing and operating facilities and in carrying out programs in particular areas of the state." § 22-51-2. "Programs" involve activities "leading to comprehensive state and community action to combat all forms of mental or emotional illness or debility" and include inpatient, outpatient, partial hospitalization, residential care, rehabilitation, and aftercare. "Facilities" are structures, equipment, and furnishings useful for the "implementing and operation of programs." *Page 994 
§ 22-51-1(4) and (8). Persons desiring to form such a public corporation must submit with the incorporation papers documents from the Department and the State Board of Health showing that the proposed facilities and programs will be in accordance with minimum standards and criteria established by those agencies and a resolution of approval from each local governing body in the area the corporation plans to serve with which it proposes to have a relationship. §§22-51-3, -5. When a certificate of incorporation identifying the programs the corporation will implement, accompanied by the necessary documents and resolutions, has been duly filed, the corporation "shall come into existence and shall constitute a public corporation vested with the rights and powers granted in this [Chapter 51] under the name set forth in such certificate of incorporation." § 22-51-6.
The public corporation so created is governed by a board of directors of nine or more members selected by the local governing bodies that authorized the formation of the corporation. § 22-51-8. The corporation's board of directors must adopt a constitution and bylaws, and the constitution and bylaws must be filed with the Department. § 22-51-9. Section 22-51-14 provides:
 "The governing bodies which are entitled to appoint a member of the board of directors are hereby authorized to appropriate their respective shares of the cost of construction of the facilities as determined upon by agreement between the board of directors and the respective governing bodies; and the said governing bodies are hereby authorized to appropriate their respective shares of the cost of operating such programs as the corporation shall have elected to implement, as determined by agreement between the Alabama Department of Mental Health and Mental Retardation, the board of directors and the respective governing bodies, notwithstanding the fact that the said facilities may be located in a county other than the county whose governing body makes the said appropriations."
Section 22-51-12 provides:
 "Nothing in this chapter shall be construed to mean that the facilities and programs provided for in this chapter are to be under the direction or control of any person other than the board of directors appointed by the governing bodies, as provided in Section 22-51-8, as long as said board of directors complies with the minimum standards of construction, maintenance and operation adopted by the State Board of Health and the minimum standards and criteria established by the Alabama Department of Mental Health and Mental Retardation."
Under Section 22-51-13, the corporation, all of its property, and all of its income "from such property and the operation of programs" are exempt from all taxation, and no excise tax may be imposed for the privilege of engaging in any of its authorized activities so long as it adheres to the minimum standards for licensure.
Section 22-15-11 empowers the corporation, among other things, to construct and maintain "facilities"; "to cooperate and contract with [the Department] for the construction, operation and maintenance of such facilities and for the operation and execution of such programs as it has elected to implement"; to exercise the power of eminent domain; to "purchase, lease, or rent any land, building, structure or facilities needed in its operation"; to acquire by purchase, gift, or otherwise any property from any person and "[t]o sell, exchange, transfer, assign, or pledge any property, or any interest therein to any person"; to *Page 995 
borrow money upon its bonds, notes, etc., and to secure such borrowing by a pledge of its revenues; to "make and execute contracts or other instruments necessary or convenient for the exercise of its powers"; to set and collect fees for services it makes available to the public, with the proviso that a person receiving services who is unable to pay the established fee will be charged only the amount he or she is able to pay; and to have perpetual succession.
The affidavit of the executive director of the Board, Jerry Tuerk Schlesinger, submitted with the summary-judgment motions filed by the Board and Abrams, states that the Board was established "under the governing bodies of the City of Mobile, the Mobile County Commission and the Washington County Commission, to deal with regional mental health issues" and that it "operates under contract with [the Department], as well as with the Alabama Department of Human Resources, Mobile County, Washington County, and the City of Mobile." As of November 2003, the Board owned and operated approximately 13 group homes and 25 vans, serving "approximately 7,800 active consumers, including the 130 patients in its residential care." Concerning the Board's funding, Mr. Schlesinger explains in his affidavit that "[n]inety percent (90%) of the Board's revenues are derived entirely from federal, state and local funding through contracts, grants, and medicaid/medicare reimbursement accounts. The balance comes from third-party, private pay and limited donations."
At the time of the accident involved in this case, a contract existed between the Department and the Board ("the contract"), the purpose of which was "for the [Department] to purchase certain community-based services from [the Board]." The contract states that the "[s]ervices to be provided, the related funding sources, and the related terms and conditions are delineated and defined in Exhibits MI-1, MR-1, SA-1, CS-1 attached hereto and made a part hereof; those exhibits, however, were not included with the contract submitted by the Board and Abrams in support of their motions for a summary judgment and, subsequently, were not included with the materials submitted with their petition to this Court. The contract provides that the parties "agree that their responsibilities one to another are contingent upon the availability of state and/or federal funds and that such responsibilities shall terminate if said funds cease to be available," and the Board acknowledges "that in the event of the proration of the fund from which payment of this contract is to be made, the contract will be subject to termination or proration."
The Board's certificate of incorporation was filed in the office of the Mobile County Probate Judge on February 28, 1975. Paragraph 5.i. of that certificate declared: "It is the intent of the incorporators that the corporation shall provide no direct services to patients or clients. It will provide through the corporation an agent for the establishment of a number of comprehensive community mental health services and/or centers." The certificate also provided that the corporation "shall . . . have the power to sue and be sued in its corporate name." Originally incorporated as the "Greater Mobile Mental Health-Mental Retardation Board, Inc.," the Board, by a 1983 amendment to the certificate, changed its name to the "Greater Mobile-Washington County Mental Health-Mental Retardation Board, Inc." The Board amended paragraph 5.i. in October 2001 to read as follows:
 "The Corporation shall provide no direct services to patients or clients suffering from mental retardation, it being *Page 996 
the intent of this amendment that except as stated herein, the Corporation shall continue to provide such mental retardation services in the manner provided for in the aforesaid original Certificate of Incorporation and as presently being provided; provided however, the Corporation shall have the power to provide (i) `targeted case management' services as now or hereinafter defined by the Alabama Department of Mental Health and Mental Retardation and (ii) services and/or treatment to those individuals with a dual diagnosis of mental illness and mental retardation but with the primary diagnosis of mental illness. In addition, the Corporation shall provide no substance abuse prevention services. It will provide for the establishment of a number of comprehensive community mental health services and/or centers. This provision shall in no way prevent the Corporation from providing other direct services to patients or clients suffering from mental or emotional illness, alcoholism, drug addiction, or epilepsy all as provided hereinabove.
 "It is intended that these services or centers be established, consistent with the overall health planning for the area, under applicable rules and regulations of the Alabama Department of Mental Health and Mental Retardation, the State Board of Health, and of the agencies of the Federal Government making funds available for the purpose, through contracts for services with community mental health centers, existing medical institutions, health departments and hospitals, and other mental health agencies, acting independently through their own administrative and professional staffs, and without intervention by the corporation in the professional-patient relationship or in the medical treatment or administrative procedures of the contracting agency concerned."
The concluding paragraph of the certificate of incorporation provides that "[i]n the event of dissolution of the Corporation, assets and property, real, personal or mixed, remaining in the Corporation shall vest in [the Department] and the said [Department] shall use said assets in property exclusively for the mental-health mental-retardation purposes for which this Corporation is organized." As noted, however, the Board has the authority to sell, exchange, transfer, assign, or pledge any property, or any interest therein, to any person.
 Sovereign Immunity
In White v. Alabama Insane Hospital, 138 Ala. 479,35 So. 454 (1903), the Court held that the Alabama Insane Hospital, also known as the Alabama Bryce Insane Hospital, was established by the legislature as "a mere state agency created for the purpose of caring for and treating the unfortunate insane citizens of the State — purely a governmental function, wise and beneficial." 138 Ala. at 483, 35 So. at 454. The hospital was maintained and supported by the direct appropriation of State moneys, and the Court preceded its holding that the hospital was protected under sovereign immunity with these observations:
 "There is a clear distinction between that class of incorporated institutions belonging to and controlled by the State and private incorporations, in the fact that the only property interest vested in the former belongs to the State. So, too, there is a distinction between this class of incorporations and municipal corporations. . . .
 "The power of the State to create a body corporate as its agent to carry on certain special kinds of work for its benefit or for the public interest cannot be doubted. And where this power is *Page 997 
exercised the institution thus established is in every sense a State institution and belongs to the State, although managed and its affairs administered under the supervision of trustees of the body corporate created for that purpose. Who doubts the right of the State to create a corporation for the management of an insane hospital, or a deaf and dumb asylum, or an institution of learning? And where they are created, who has the property interest in these institutions? Clearly the State. In the exercise of its right of sovereignty it established them for public purposes; it donates the property or the funds to purchase it upon which they are built, supplies the means by which they are maintained and operated. They have no capital stock, or shares held by individuals. Indeed, they have no membership or stockholders. They are not created for profit, but solely as public benefactors, the beneficiaries being the people who compose the State. Should the State, through its legislative department, see fit to repeal the act of incorporation and provide some other or different agency or trustee to manage and control such an institution, where is the obstacle in its doing so? It would clearly violate no contractual obligation or otherwise infringe upon the property rights of any person, for no individual has any personal pecuniary interest in the incorporation as such; therefore no right to complain of its destruction.
 "Not even the trustees appointed under the act incorporating the defendant would be pecuniarily affected by a repeal of its charter. No compensation is allowed them for the services they are to render, and they otherwise have no special pecuniary interest either in the continued existence of the corporate entity they represent, or its welfare as a going concern."
138 Ala. at 481-82, 35 So. at 454.
Article I, § 14, of the Constitution of 1901, provides: "[T]he State of Alabama shall never be made a defendant in any court of law or equity."
 "This Court has held that `the use of the word "State" in Section 14 was intended to protect from suit only immediate and strictly governmental agencies of the State.' Tallaseehatchie Creek Watershed Conservancy Dist v. Allred, 620 So.2d 628, 631
(Ala. 1993) (quoting Thomas v. Alabama Mun. Elec. Auth., 432 So.2d 470, 480 (Ala. 1983)). Thus, we must determine what constitutes an `immediate and strictly governmental agenc[y].' The test for determining whether a legislatively created body is an immediate and strictly governmental agency for purposes of a sovereign-immunity analysis involves an assessment of (1) the character of the power delegated to the body; (2) the relation of the body to the State; and (3) the nature of the function performed by the body. Armory Comm'n of Alabama v. Staudt, 388 So.2d 991, 993 (Ala. 1980)."
Rodgers v. Hopper, 768 So.2d 963, 966 (Ala. 2000).
As Rodgers noted, this Court articulated a three-factor test in Armory Commission of Alabama v.Staudt, 388 So.2d 991 (Ala. 1980), for determining whether a legislatively created body is a State agency entitled to sovereign immunity. Staudt involved a personal-injury action against the Armory Commission of Alabama, a corporation. Quoting extensively from the excerpt from White set out earlier, the Court concluded that "[t]he fact of incorporation alone, then, in no way affects the character of a state institution, and if the Armory Commission is not immune from suit, it must be for reasons other than its status *Page 998 
as a separate body corporate." 388 So.2d at 993.
In formulating its three-factor test, the Staudt Court relied heavily on State Docks Commission v. Barnes,225 Ala. 403, 143 So. 581 (1932). In Barnes, the Court determined that the State Docks Commission was entitled to recognition as an arm of the State shielded by sovereign immunity. Important to that determination was the fact that the legislation creating the Commission provided that all facilities constructed and operated by the Commission would remain under the management and control of the State, that title to all property so acquired would vest in the State, and that the funds of the Commission belonged to the State. As the Court subsequently explained in Staudt about the situation inBarnes, "in the lawsuit, those funds would have been subjected to liability." 388 So.2d at 993. Staudt
emphasized that "[a]ll factors in the relationship must be examined to determine whether the suit is against an arm of the state or merely against a franchisee licensed for some beneficial purpose." 388 So.2d at 993. In deciding that the Armory Commission "operate[d] as an arm of the State" protected by sovereign immunity, the Court emphasized that substantial appropriations for the Commission were made through the military department, payable from the funds in the State treasury, and that the governor could use "any appropriation for military purposes to pay expenses or obligations of the Commission."388 So.2d at 993.
 "We have said that a lawsuit directly affecting a state contract or property right is tantamount to a suit against the state. Gill v. Sewell, 356 So.2d 1196 (Ala. 1978). A judgment in favor of Ms. Staudt would directly diminish amounts appropriated to the Commission, and, should the Commission appropriation become insufficient, the governor may find it necessary to supplement the Commission appropriation with funds from the general military appropriation. Without doubt, a judgment against the Armory Commission would adversely affect the state treasury."
388 So.2d at 993-94.
The following body of caselaw has evolved out of the Court's efforts to apply the Staudt three-factor test to the various entities claiming the protection of sovereign immunity in various settings.
In Deal v. Tannehill Furnace Foundry Commission,443 So.2d 1213 (AIa. 1983), the Court concluded that "the commission's character, its function, and its funding identify the commission as the State of Alabama for purposes of § 14." 433 So.2d at 1216. Organized "`to establish, operate, and maintain as a state park or historic site the land and buildings'" in Tuscaloosa County where an early ironworks had been located, the commission was constituted'" a body corporate'" but expressly declared to be "`a state agency.'"443 So.2d at 1214-15 (quoting §§ 41-9-320, 41-9-324, and41-9-325, Ala. Code 1975). Citing Staudt, the Court declared that "[resolution of the issue [whether the commission was immune from suit] cannot turn on the use of labels."443 So.2d at 1216. The Court pointed out that in bothBarnes and Staudt, "the funds of each [entity] were found to be directly affected by a lawsuit because subjected to liability, and thus a lawsuit against either was tantamount to a lawsuit against the State itself."443 So.2d at 1216. Pivotal to the Court's ultimate conclusion that the commission was created as an arm of the State to carry out an important function of state government was the fact that the commission was funded by the Alabama Legislature. "It is certainly conceivable that a judgment for plaintiff would directly diminish any monetary *Page 999 
appropriation made by [the legislature] out of the State treasury to the commission. Thus, this lawsuit directly affects a state property right and is `tantamount to a suit against the state.' Gill v. Sewell, 356 So.2d 1196 (Ala. 1978)."443 So.2d at 1216.
In determining that Auburn University was an instrumentality of the State immune from suit, the Court in Rigby v. AuburnUniversity, 448 So.2d 345 (Ala. 1984), relied on its declaration in a 1909 case that it was settled law in this State "`that public institutions created by the state purely for charitable or educational purposes are a part of the state, or a mere agency of the state; that the property of such corporations is really and in fact the property of the state. . . .'"448 So.2d at 346.
In Tallaseehatchie Creek Watershed Conservancy District v.Allred, 620 So.2d 628 (Ala. 1993), the issue was whether a watershed conservancy district was clothed with sovereign immunity. Legislation established the State Soil and Water Conservation Committee, which, in turn, was given authority to create soil and water conservation districts upon petition of local landowners. The conservation districts operated under the supervision of the committee and worked primarily to prevent soil erosion. The legislation creating the committee also authorized the creation of watershed conservancy districts. The legislation declared that a soil and water conservation district "shall constitute a governmental subdivision of this state and a public body, corporate and politic, exercising public powers" and that a watershed conservancy district was "[a] subdivision of a soil and water conservation district which constitutes a governmental subdivision of this state and a public body, corporate and politic. . . ." 620 So.2d at 629.
The Court in Allred reiterated the Staudt
test and declared it "a test that emphasizes substance over form for determining whether legislatively created entities are covered by sovereign immunity." 620 So.2d at 630. The Court identified numerous factors suggesting that a watershed conservancy district was an agency of the State, but also identified a number of factors seeming to favor characterizing a watershed conservancy district "as a public corporation or separate entity." 620 So.2d at 630. Indicative to the Court of State-agency status were the facts that a watershed conservancy district was statutorily authorized to act as an agency of the State, had the power of eminent domain, and was exempt from state and local taxation, and, particularly important, that the State comptroller was authorized to pay all administrative and other expenses incurred by the State Soil and Water Conservation Committee and the soil and water conservation districts "to the limit of the appropriation for those entities."620 So.2d at 630. The Court noted that it had often held that sovereign immunity would preclude an action for damages against a legislatively created entity when the State treasury would be adversely affected by the payment of damages and that "[h]ere, it is possible that a judgment for the plaintiff would be paid out of the state treasury, at least to the extent of the appropriation." 620 So.2d at 630.
Attributes of watershed conservancy districts that seemed to the Court to favor characterizing them as separate entities were that the legislation creating soil and water conservation districts and watershed conservancy districts allowed both to sue and be sued; watershed conservancy districts could "sell and dispose of property, make contracts, and issue bonds," which were "`solely and exclusively obligations of the district and . . . not . . . an obligation *Page 1000 
or debt of the state of Alabama or any county or municipality therein. . . .'" 620 So.2d at 630 (emphasis omitted). That latter provision was seen to clearly contemplate that a watershed conservancy district was an entity separate and apart from the State and, coupled with the previously noted provision authorizing the State comptroller to pay the expenses of such a district, "introduce[d] an element of ambiguity into the crucial question of the financial responsibility of any judgment adverse to a [watershed conservancy district]." 620 So.2d at 630.
Given what the Court termed the "inconclusive" result from application of the Staudt test, it relied on a ruling by the United States Court of Appeals for the Sixth Circuit holding that a watershed conservancy district organized under Tennessee statutes almost identical to the Alabama statutes was a political unit sufficiently independent that it could not be considered an agency of the state. Important to that analysis was the fact that the Tennessee statutes allowed a watershed conservancy district to sue and be sued in its corporate name. This Court concluded that denying a watershed conservancy district recognition as an agency of the State was in accord with its declaration in Thomas v. Alabama Municipal ElectricAuthority, 432 So.2d 470 (Ala. 1983), quoted in the excerpt from Rodgers, supra, that the use of the word "State" in § 14 "was intended to protect from suit only immediate and strictly governmental agencies of the State."620 So.2d at 631.
Applying the Staudt test in a case where the real issue was whether the Mobile County Communications District ("MCCD") qualified as a "governmental entity" under the statute imposing a "cap" on damages recoverable against a governmental entity, the Court held:
 "[T]wo factors are predominant and thus determinative here: 1) As authorized by the empowering statute (Act No. 84-369), the Mobile County Commission, following a public referendum, created the MCCD by way of a county ordinance, and Mobile County, along with the City of Mobile, operated the system; and 2) the `power to sue and to be sued' language in the empowering statute is incompatible with the constitutional immunity with which state agencies are cloaked."
Wassman v. Mobile County Communications Dist,665 So.2d 941, 943 (Ala. 1995).
In Stallings Sons, Inc. v. Alabama BuildingRenovation Finance Authority, 689 So.2d 790 (Ala. 1997), the Court noted that the Staudt test "examines the complete relationship between the state and the entity seeking immunity from suit." 689 So.2d at 792. Considering first the character of power delegated to the Alabama Building Renovation Finance Authority in the legislation creating the Authority, the Court pointed out that the legislation granted the Authority the right "to sue and be sued" and that it had accorded similar language in Staudt importance because, inasmuch as the AlabamaConstitution prohibits an action against the State, the legislature could not declare an entity vulnerable to suit if it was in fact a State agency. "Although, such a clause is not determinative of an Authority's status, it does show the intent of the legislature to create a separate entity rather than an agency or arm of the state." 689 So.2d at 792. Proceeding to examine the relation of the Authority to the State, the second factor of the Staudt test, the Court noted that the legislation creating the Authority provided that all obligations and bonds of the Authority would be its exclusive obligation and could not constitute an obligation or debt of the State. The Court expressed its agreement *Page 1001 
with the argument of the plaintiff that, by virtue of the inclusion of that language in the legislation, "the Authority, if it is an arm of the state, cannot perform its necessary functions without violating § 213, Ala. Const. 1901, which provides that `any act creating or incurring any new debt against the state, except as herein provided for, shall be absolutely void.'" 689 So.2d at 792.
The Court in Stallings Sons discounted the fact that the governor, the State finance director, and the State treasurer were members of the Authority's board of directors, observing that "[m]any authorities include state officials as members of their boards of directors." 689 So.2d at 793. Such participation by State officers was deemed not to be "determinative" of the question. Finally, in assessing "the nature of the function performed by the Authority,"689 So.2d at 793, the Court acknowledged that the legislature had declared that it had established the Authority "for the sole purpose" of renovating, reconstructing, improving, etc., public office buildings. The trial judge had noted in his order that "[t]he Authority holds title to and maintains the following public buildings: the Alabama State House; the Folsom Administrative] Building; the Public Health Building; the Judicial Building; the Public Safety Building; the Archives and History Building; and the State Office Building." 689 So.2d at 792 (footnote indicating that the "Judicial Building" referred to in the act creating the Authority was not the building currently occupied by the judicial department omitted). Acknowledging that "[t]he function of the Authority is intricately intertwined with its relationship with the state," the Court concluded that it "need not examine this fact any further," 689 So.2d at 793, because it had already essentially held that if the Authority was an arm of the State, many of its functions that would necessarily incur debt could possibly violate § 213 of the Alabama Constitution.
The Court noted that the facts of Stallings Sons
were clearly distinguishable from those of Barnes, which held that the State Docks Commission was an arm of the State, because (1) the State owned the docks facilities in its own name, whereas the Authority, not the State, held title to the various public buildings entrusted to it; (2) the Docks Commission operated the docks facilities as an agent of the State, whereas the Authority was directly charged with maintaining its buildings; and (3) the funds generated by the docks facilities belonged to the State and would have been subjected to liability in the law-suit at issue, whereas proceeds derived from the sale of any bonds issued by the Authority were to be held in a separate account in the State treasury, subject to be drawn on by the Authority. The significance of the fact that the Authority held title to all of its property in its own name was not diminished by the fact that its enabling legislation provided that upon dissolution of the Authority its property would revert to the State.689 So.2d at 793. Having examined "the complete relationship" between the State and the Authority, the Court concluded that it was "clear that the Authority was created as a separate entity" and "not as an arm of the State," despite the fact that the legislation creating it expressly declared that it was "an agency of the State." 689 So.2d at 792.
The last of our cases to undertake a thorough analysis and application of the Staudt three-factor test isRodgers, supra, decided in 2000. In Rodgers, the Court was called upon to determine whether the Alabama Correction Institution Finance Authority ("ACIFA") qualified as a State agency. Reiterating the proposition that only "immediate and strictly governmental *Page 1002 
agencies of the State," 768 So.2d at 966, were protected by sovereign immunity, the Court undertook to apply theStaudt test, beginning with a look back at its application in Allred. The Court noted that inAllred, despite the "decidedly governmental characteristics" enjoyed by watershed conservancy districts, such as "the customary governmental power of eminent domain," exemption from state and local taxation, and legislative appropriations, it had concluded that a watershed conservancy district was an independent agency. 768 So.2d at 967.
 "This Court based its holding in that case on several key characteristics that distinguished [watershed conservancy districts] as entities separate from the State. Those characteristics included the ability to: (1) sue and be sued; (2) enter into contracts; (3) sell and dispose of property; and (4) issue bonds. [Allred, 620 So.2d] at 630 (citing §§ 9-8-25(a)(13), 9-8-61(6), and 9-8-61(4) and (5)). Notably, the Legislature also had expressly provided that debts and obligations of a [watershed conservancy district] were not the State's debts and obligations. Id. (citing § 9-8-61(3)). We found this final characteristic to be dispositive, stating:
 "`This last provision clearly contemplates that [watershed conservancy districts] are entities separate and apart from the State; the provision also introduces an element of ambiguity into the crucial question of the financial responsibility for any judgment adverse to a [watershed conservancy district].'
 "[Allred], 620 So.2d at 630."
768 So.2d at 967.
The Rodgers Court was impressed that, like the watershed conservancy districts in Allred, ACIFA had "qualities suggesting that it is an entity independent of the State," including "(1) the power to sue and be sued; (2) the power to enter into contracts; (3) the power to sell and dispose of property; (4) the power to issue bonds; and (5) exclusive responsibility for its financial obligations (the same quality that we found dispositive in [Allred])."768 So.2d at 967. The Court dismissed ACIFA's argument that "notwithstanding that it has those qualities, it is organizationally intertwined with the State by virtue of the State's oversight power regarding ACIFA's chief operating activity — prison construction," observing that the oversight power was "not different from the power to direct operations that is commonly exercised by the owner of any ordinary business." 768 So.2d at 967. The Court stated that "[r]ather than looking to ACIFA's operations, we must look to its organizational and financial structure, as we did with the [watershed conservancy districts] in [Allred]," and concluded that the ACIFA, "and, derivatively, its officials are not entitled to sovereign immunity." 768 So.2d at 967.
Mooneyham v. State Board of Chiropractic Examiners,802 So.2d 200 (Ala. 2001), was decided by the Court the year after Rodgers, and its resolution of the sovereign-immunity issue was not accompanied by any in-depth analysis. After quoting from Rodgers, supra, reiterating the principle that § 14 immunity extends only to immediate and strictly governmental agencies of the State, and reciting the three factors of the Staudt test, the Court simply stated the following in explaining its conclusion that the legislatively created Board of Chiropractic Examiners was a State agency entitled to the protection of sovereign immunity:
 "The Board is authorized to control the licensing of chiropractors, § 34-24-161, and is charged with regulating the chiropractic profession, § 34-24-166. Although *Page 1003 
the Board may collect certain fees to generate revenue, it is required by law to deposit those funds in the State Treasury, which sets aside those funds for the Board's use. § 34-24-143. Under § 34-24-143, those funds are appropriated to the Board `to defray the expenses incurred' in carrying out the Board's charges.
 "Our examination of the statutes creating and empowering the Board shows that the Board is a regulatory body that receives its funding from the State.
"802 So.2d at 204.
Apparently, the fact that the Board's revenues were deposited into the State treasury was a determinative factor.
 Application of the Staudt Test in this Case
As was true for many of the entities considered for sovereign-immunity eligibility in the caselaw reviewed above, some attributes of the Board and some aspects of its relation to the State suggest that the Board is an agency of the State, although other of its attributes and aspects of its relationship with the State favor characterizing it as a separate entity for purposes of § 14. However, after examining all the factors in the relationship between the Board and the State and the complete relationship, as Staudt and Stallings Sons instruct, we find that elements favoring characterization of the Board as an entity separate from the State predominate.
As we look to the three factors identified as relevant inStaudt, and as elaborated upon in subsequent cases, we are mindful that caring for and treating citizens of this State suffering from various forms of mental or emotional illness or debility is "purely a governmental function, wise and beneficial." White, 138 Ala. at 483, 35 So. at 454. Statutorily the Board is granted the power of eminent domain, and its property, income, and activities are exempt from all taxation. § 22-51-11(5), § 22-51-13. AlthoughAllred acknowledged that those features suggest a State-agency relationship, the Court in that case concluded that despite those factors, the entity there was an independent agency and was not entitled to sovereign immunity. See alsoRodgers, 768 So.2d at 967, commenting on the reasoning in Allred. The Department and the State Board of Health exercise a certain amount of oversight over the Board (§22-51-3(3); -7(1)(3); -9; -11(3); -12; and -14), but that oversight power is no more than was deemed inconsequential inRodgers, 768 So.2d at 967; it does not reach the level of State control found by White and Barnes to be indicative of an entity's status as a State agency.
Indicative of the Board's status as an independent entity are the powers accorded it by § 22-51-11, including the power to construct and maintain "facilities"; to cooperate and contract with the Department and the State Board of Health for the construction of those facilities and with the Department for the operation and maintenance of the facilities and the operation and execution of the programs the Board elects to implement; to acquire by purchase, lease, or rent any hospital, land, building, structure, or facility, or any other type of property, holding the same in its own name; to improve its property; "[t]o sell, exchange, transfer, assign, or pledge any property, or any interest therein to any person"; to obtain insurance against such risks as it might deem advisable; "[t]o borrow money upon its bonds, notes, warrants, debentures or other evidences of indebtedness and to secure the same by pledges of its revenues"; "[t]o make and execute contracts and other instruments necessary and convenient to the exercise of its powers"; and to determine reasonable fees for the services it makes available *Page 1004 
to the public and to collect them subject to reduction to the amount the individual is able to pay.
Ownership by the State of the property used, operated, or maintained by an entity has been held to be an indicia of State agency status (White, Barnes), whereas ownership of the property in the name of the entity has been considered indicative of its independent status, particularly when the entity is authorized to sell or dispose of the property (Allred Stallings, Rodgers). The fact that the final paragraph of the Board's certificate of incorporation provides that "[i]n the event of dissolution of the Corporation, assets and property, real, personal or mixed, remaining in the Corporation shall vest in the [Department]" does not alter the significance of the fact that the Board is authorized to own all of its property in its own name and to sell or otherwise dispose of it. Stallings Sons, 689 So.2d at 793. We have held that the power to make contracts suggests independent status (Allred, Rodgers). The fact that the Board is authorized to borrow money by issuing its own bonds, notes, warrants, etc., and to secure that indebtedness by a pledge of its revenues, so that the indebtedness is not an obligation of the State, is significant. Allred 620 So.2d at 630,Stallings Sons, 689 So.2d at 792, andRodgers, 768 So.2d at 967.
As noted above, the "oversight" accorded the Department falls far short of the control deemed indicative of State-agency status, and § 22-51-12 emphatically states that the "facilities and programs" of the Board will not be under the direction or control of any person other than its directors so long as they comply with the minimum standards adopted by the Board of Health and the Department. This declaration of autonomy strongly suggests an independent status.
In White, the Court emphasized that the State, in establishing the Alabama Insane Hospital, donated the property on which the facility was located or provided the funds for the purchase of the property, and "supplie[d] the means" by which the facility was maintained and operated. 138 Ala. at 482,35 So. at 454. In Barnes, it was important that the funds of the State Docks Commission, "which belonged to the State[,] would be subjected to liability for the judgment" should one be entered against the Commission. 225 Ala. at 406, 143 So. at 583. Deemed compelling in Staudt was the fact that State appropriations were made for the Armory Commission through the military department, and the governor was authorized to use additional military appropriations to pay expenses or obligations of the commission, so that
 "[a] judgment in favor of [the plaintiff] would directly diminish amounts appropriated to the Commission, and, should the Commission appropriation become insufficient, the governor may find it necessary to supplement the Commission appropriation with funds from the general military appropriation. Without doubt, a judgment against the Armory Commission would adversely affect the state treasury."
388 So.2d at 993-94. Likewise, this Court noted the following in Deal, 443 So.2d 1213, 1216:
 "[T]here is evidence in the record that the Tannehill commission is funded by the Alabama legislature. It is certainly conceivable that a judgment for plaintiff would directly diminish any monetary appropriation made by that body out of the State treasury to the commission. Thus, this lawsuit directly affects a state property right and is `tantamount to a suit against the state.' Gill v. Sewell, 356 So.2d 1196 (Ala. 1978)." *Page 1005 
As far as we can tell from our review of the statutes cited and of the materials supplied by the parties in this case, including the affidavit of Mr. Schlesinger, the Board receives no direct appropriations from the State treasury. The legislation authorizing the creation of the Board envisioned that it would "contract with" the Department and the State Board of Health to construct and operate facilities and carry out programs (§22-51-2), and contemplated appropriations from the local governing bodies to cover the costs of the construction and operation of the facilities (§ 22-51-14). Mr. Schlesinger states that the Board operates under contract with the Department, the Alabama Department of Human Resources, Mobile County, Washington County, and the City of Mobile. As noted, he explains that 90% of the Board's revenues "are derived entirely from federal, state and local funding through
contracts, grants, and medicaid/medicare reimbursement accounts" with the balance coming from "third-party, private pay, and limited donations." (Emphasis supplied.) We are given no indication that a judgment against the Board would in any way impact the State treasury. The contract between the Department and the Board provides that the Department will purchase certain community-based services from the Board using funding sources explained in exhibits to the contract but not included in the materials submitted to this Court.
We have previously noted as pertinent, but not determinative, that the legislation creating or authorizing the entity in question expressly characterizes the entity as an agency of the State. Barnes, Deal, Allred, and Stallings Sons. No such characterization appears in § 22-51-1 et seq., Ala. Code 1975, authorizing the formation of a public corporation such as the Board. We have held that language in the empowering statute providing that the subject entity has the power "to sue and to be sued" is strongly probative of "the intent of the legislature to create a separate entity rather than an agency or arm of the state," Stallings Sons, 689 So.2d at 792. We have stated that such language is "incompatible with the constitutional immunity with which state agencies are cloaked," Wassman, 665 So.2d at 943;Rodgers, 768 So.2d at 967. Although the legislature did not include the power to sue and be sued among those it authorized the Board to exercise, the Board included within the declared powers in its certificate of incorporation "the power to sue and be sued in its corporate name. . . ." While this statement cannot be said to reflect an intention of the legislature, it does reflect the intention of the incorporators of the Board and is part of the organic structure of the Board.
Having examined the complete relationship between the State and the Board and mindful that the provision of § 14 that "the State of Alabama shall never be made a defendant in any court of law or equity" was intended to protect from suit "only immediate and strictly governmental agencies of the State" (Mooneyham,Rodgers, Allred, Thomas), we conclude that the Board is an independent entity rather than a State agency and, thus, is not entitled to sovereign immunity. As noted, the Department is authorized by § 22-50-9, Ala. Code 1975, "to act in any prudent way to provide mental health services and mental retardation services for the people of Alabama." We do not ignore the fact that § 22-50-15 provides that "[a]ny state supported facility under the jurisdiction of the department" that provides residential services to patients, "including, but not limited to, Bryce Hospital, Searcy Hospital, and Partlow State School and Hospital," is to be considered "an essential function of the state" so that "funds allocated for the support of said state supported facilities shall not be subject to proration at any *Page 1006 
time a deficit occurs in the general funds." As we have explained, it nowhere appears in the statutes referenced by the parties or the materials submitted by them that any State funds are allocated for the support of the Board or any facility operated by it; it is not otherwise shown to be "state supported"; and it is not technically "under the jurisdiction of the department." Statutorily, the Department has the authority and discretion directly to provide mental-health services and mental-retardation services for the people of Alabama and has elected to do so through its ownership and operation of such institutions as Bryce Hospital, Searcy Hospital, and W.D. Partlow Developmental Center, formerly known as Partlow State School. Alternatively, the Board is authorized to enter into contracts by which other entities — public, private, or mixed — will own and operate the facilities. The fact that mental-health services are being provided does not answer the question of whether the entity providing them qualifies as a State agency entitled to the protection of sovereign immunity.
Because the Board is not a State agency, it necessarily follows that Abrams, as its employee, is not a candidate for State-agent immunity under Ex parte Cranman, 792 So.2d 392
(Ala. 2000); consequently, we need not analyze her duties and job responsibilities and her conduct on the occasion in question in terms of whether they fit within any of the Cranman
categories of State-agent immunity.
 Substantive Immunity
The Board contends that, independent of the question of sovereign immunity, it is entitled to "substantive immunity" under the rationale of Rich v. City of Mobile,410 So.2d 385 (Ala. 1982); Calogrides v. City of Mobile,475 So.2d 560 (Ala. 1985); Garrett v. City of Mobile,481 So.2d 376 (Ala. 1985); and Hilliard v. City ofHuntsville, 585 So.2d 889 (Ala. 1991). "Rich
created a narrow exception to the rule of general liability for municipalities in situations in which the public policy considerations of a city's paramount responsibility to provide for the public's safety, health, and general welfare outweighed the reasons for the imposition of liability on the municipality." City of Mobile v. Jackson,474 So.2d 644, 649 (Ala. 1985). The difficulty in deciding just what municipal services qualify for this immunity is exemplified by the split on the Court in Ziegler v. City of Millbrook,514 So.2d 1275 (Ala. 1987), in which five Justices concluded that no substantive municipal immunity existed under the circumstances of the case, but four Justices were of the opposite opinion. See also the dissent of Chief Justice Hooper, joined by Justices Shores and Cook, in Belcher v. City ofPrichard, 679 So.2d 635 (Ala. 1996). Regardless of the reach of the doctrine of substantive immunity, this Court has recently explained that "[s]ubstantive immunity does not immunize a municipality from vicarious liability for the tortious act of a particular police officer." Hollis v.City of Brighton, 885 So.2d 135, 144 (Ala. 2004).
The Board argues that it provides an essential public service in caring for, housing, and treating the mentally ill and men tally retarded and that the legislature in § 22-50-15 has declared the service it provides an "essential function" of the State. As explained above, the Board does not fall under the definitional criteria of § 22-50-15 because the statutory schemes creating the Department and authorizing the creation of the Board do not provide that the Board is to be "state supported" or "under the jurisdiction of the department," and there has been no showing that any funds are legislatively allocated for the support of any facility operated by the Board. Thus, under the applicable standard of review, according, as we must, the nonmoving party all reasonable inferences *Page 1007 
from the evidence, we cannot hold that the Board has shown a clear legal right to a summary judgment in its favor based on substantive immunity.
 Conclusion
The petitioners have not shown that the Board is a State agency for purposes of § 14 of the Constitution and Abrams thus cannot be classified as a State agent or employee; the Board has not shown that it is entitled to "substantive immunity" from liability predicated upon the alleged negligence or wantonness of Abrams. Therefore, the petitioners have not shown that they are clearly entitled to the writ of mandamus directing the trial court to enter a summary judgment in their favor for those reasons. Accordingly, the petition is denied.
PETITION DENIED.
NABERS, C.J., and SEE, LYONS, WOODALL, STUART, SMITH, BOLIN, and PARKER, JJ., concur.